[No. 2129]

## STATE OF NEVADA, RESPONDENT, *v.* JOSE SALGADO, APPELLANT.

[145 Pac. 919 and 150 Pac. 764]

1. JURY—CHALLENGE FOR ACTUAL BIAS—SUFFICIENCY—"ACTUAL BIAS."

Rev. Laws, secs. 7145, 7146, allow a challenge for cause on the general ground that a juror is disqualified for want of any qualification prescribed by law, and on the particular ground that he is disqualified from serving in the action on trial. Section 7147 allows a challenge for such a state of mind on the part of the juror as leads to a just inference that he will not act with entire impartiality, designated "actual bias." Section 7150 provides that in a challenge for actual bias it must be alleged that the juror is biased against the party challenging him, but that no one shall be disqualified by reason of a formed or expressed opinion on the matter in issue, provided that it appears to the court that he can act impartially in the trial. *Held*, that a challenge "for actual bias," not stating any ground upon which the challenge rested or any reason on which it was made or the party against whom the jury was biased, was in form insufficient. (NORCROSS, J., dissenting.)

2. JURY—COMPETENCY—BIAS.

A juror in a trial for murder who, from what he had read and heard, had formed and expressed an opinion going to the merits of the case, and had talked about it with several persons, none of whom had witnessed the homicide, and who on inquiry stated that he had an opinion as to defendant's guilt which would require testimony to remove, but that he would lay such opinion aside and try the case on the evidence, was not incompetent on the ground of actual bias.

3. HOMICIDE—HARMLESS ERROR—ADMISSION OF EVIDENCE.

In a prosecution for homicide, where the age of the deceased girl was not a material issue in the case, error, if any, in allowing a state's witness to answer a question calling for her apparent age, was harmless.

4. CRIMINAL LAW—OPINION EVIDENCE—AGE OF DECEDENT.

In a trial for murder, a witness for the state was competent to express his opinion as to the age of the deceased girl, based upon his observations made at the time of the homicide, where such evidence was not very important under the issues.

5. HOMICIDE—EVIDENCE—ACTS AND DECLARATIONS.

A statement by accused a very short time after the stabbing, which he was seen to do, that he had no knife and had not cut decedent, was admissible as showing a consciousness of guilt.

6. CRIMINAL LAW—EVIDENCE—COLLATERAL OFFENSES.

In a prosecution for killing by stabbing, evidence that the defendant stabbed another man during a fight over the deceased

a few minutes before he stabbed the deceased was admissible under the exception to the rule excluding evidence of collateral crimes, in that it was with reference to a contemporaneous crime, the circumstances of which were inseparable from the crime charged.

7. HOMICIDE—EVIDENCE—POSSESSION OF WEAPONS.

In a prosecution for killing by stabbing, evidence that defendant had had in his possession a knife similar to the one found in close proximity to the scene of the stabbing was admissible; objection thereto going rather to its weight than its admissibility.

8. HOMICIDE—EVIDENCE—DEFENDANT'S POSSESSION OF WEAPON— IDENTIFICATION.

The identification of a knife as that in defendant's possession the afternoon before the homicide and as the one used by defendant when he stabbed the deceased *held* to warrant its admission in evidence.

## ON REHEARING

9. CRIMINAL LAW—HOMICIDE—INSTRUCTIONS—IRRESISTIBLE PASSION —EXPRESS MALICE.

An instruction was given defining "irresistible passion" as meaning "that at the time of the act the reason is disturbed or obscured by passion to an extent which might render ordinary men of fair average disposition liable to act rashly, or without due deliberation or reflection, and from passion rather than judgment," followed with the statement: "Nor will irresistible passion, if proved to have existed, be sufficient to reduce the degree of the offense where the killing was done with express malice, as heretofore defined; under our statute express malice necessarily renders any murder murder of the first degree," express malice having previously been defined in the language of the statute as "that deliberate intention unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof": *Held*, error, for the reason that the instruction assumes that "irresistible passion" and "express malice" could have coexisted in the case.

10. CRIMINAL LAW—HOMICIDE—INSTRUCTIONS—IRRESISTIBLE PASSION —EXPRESS MALICE.

An instruction which is the equivalent of saying to the jury: "Nor will the fact that the killing was done without due deliberation, if proven so to have been done, be sufficient to reduce the degree of the offense if the killing was done with deliberate intention," is confusing, contradictory, and erroneous.

11. CRIMINAL LAW—HOMICIDE—INSTRUCTIONS—IRRESISTIBLE PASSION —EXPRESS MALICE.

An instruction erroneously assuming that irresistible passion and express malice may coexist, and, if found to coexist, the element of express malice renders the killing murder in the first degree, is confusing, contradictory, erroneous, and prejudicial.

12. CRIMINAL LAW—HOMICIDE—IMPLIED MALICE—SUDDEN PASSION.
Implied malice and sudden passion may coexist, in which case the offense is not reduced to the grade of manslaughter, but is murder of the first or second degree, depending upon the degree of passion.

13. CRIMINAL LAW—HOMICIDE—IRRESISTIBLE PASSION—DEGREE OF OFFENSE.
If irresistible passion is proven to have existed, the homicide could not have been committed with express malice, and would not constitute murder of the first degree.

14. CRIMINAL LAW—HOMICIDE—PASSION—DEGREE OF MURDER.
Where it appears from the evidence to the satisfaction of the jury that there are sufficient facts to cause in the defendant a heat of passion insufficient to reduce the crime to manslaughter, but sufficient to prevent the killing from being with that deliberate premeditation required to constitute murder in the first degree, it would be the duty of the jury to bring in a verdict of murder in the second degree.

15. CRIMINAL LAW—HOMICIDE—INSTRUCTIONS—EXPRESS MALICE.
An instruction was given reading: "And if the jury should find from the evidence the existence of facts and circumstances establishing beyond a reasonable doubt that the defendant had such a reckless disregard of human life as necessarily includes a formed design against the life of Bessie Andy, the killing, if it amounts to murder, would be on express malice, and consequently would be murder of the first degree." *Held*, erroneous where the facts in evidence showing the manner of the killing are not such of themselves as to establish necessarily a formed design, so as to preclude every other consideration except that of first degree murder.

16. CRIMINAL LAW—INSTRUCTIONS—EXPRESS MALICE.
Where death is produced by the common methods of stabbing or shooting, unless accompanied by other peculiar circumstances, the mere fact of stabbing or shooting would not of itself preclude other circumstances negativing a formed design against the life of the deceased.

McCARRAN, J., dissenting.

APPEAL from the Fourth Judicial District Court, Elko County; *E. J. L. Taber*, Judge.

Jose Salgado was convicted of murder in the first degree, and he appeals. **Affirmed,** with direction as to sentence.

*Klein & Hale*, for Appellant.

*Geo. B. Thatcher*, Attorney-General, and *E. P. Carville*, for the State.

By the Court, McCARRAN, J.:

The defendant was convicted of murder in the first degree for the killing of an Indian girl known as Bessie Andy. From the judgment, and from an order denying a motion for a new trial, defendant has appealed.

The killing took place on the main street of the town of Elko. The defendant, after throwing the girl into a mud puddle in the street, and after stabbing another party, who appears to have been a companion of the girl on that afternoon, returned to the spot where the girl stood, and plunged his knife into her body some three of four times, causing almost instant death.

The record in this case, in so far as the testimony is disclosed thereby, fails to set forth, with any degree of satisfaction, any particular motive for the killing. The defendant testified in his own behalf during the trial, and stated that he was a native of Mexico, 23 years of age, and from his statement it may be gathered that the defendant and the woman whom he killed had been living together for a number of years. The deceased was an Indian woman, about 20 years of age. The defendant stated that on occasions when he came to town a certain Mexican, or half-breed, who, it appears, met the defendant and Bessie Andy, the deceased woman, immediately before the homicide, was always trying to make trouble with him, and it might be gathered by inference from his various statements that bad blood existed between the defendant and this half-breed Indian or Mexican and that Bessie Andy, the deceased, was the "woman in the case" about whom the unfriendly relations had grown up between the defendant and the half-breed. The defendant in his testimony, in relating occurrences immediately preceding the homicide, said that the half-breed wanted Bessie to go with him, and had made a threat that if Bessie did not go with him that he would kill Bessie and the defendant. Counsel for defendant asked, "What did the Mexican say he wanted with Bessie?" to which the defendant replied, "He wanted to take her to Golconda."

.The father of Bessie Andy testified that the defendant had been about the Indian camp for some weeks prior to the homicide, and that the defendant and Bessie, daughter of the witness, had been together at least a part of this time. Just prior to the killing, the defendant and Bessie Andy, together with the father and mother of the latter, had dinner together at a Chinese restaurant. It appears from the testimony of the father of the girl that they had liquor, and that he became quite intoxicated. After the dinner the four, consisting of the defendant and the deceased girl, and the father and mother of the latter, left the restaurant and started toward the Indian camp, passing through the business section of the town of Elko on the way. The defendant and the deceased girl, who were traveling together on the way from the restaurant toward the Indian camp, met the half-breed Indian boy, or half-breed Mexican, as he is sometimes termed in the testimony of the several witnesses. The latter was in company with one Jim Odell on the occasion of the meeting, and from the deposition of Odell, taken at the preliminary examination and admitted in evidence, it appears that the defendant asked where they were going, and the half-breed boy replied:

"We are going to sleep."

"Then," said Odell, "the Indian girl, Bessie, said something to the (half-breed) Indian boy in Indian. I don't know what she said, and he answered her, and then he (meaning Jose Salgado) turned around and started to hitting Bessie."

"Q. Then what followed, if anything? A. Then she fell at my feet, and she begged me and the Indian boy to make him stop, and she got up on her feet and started across the street, and the defendant run around in front of her, and pushed her down in the water and went on top of her and started to beating her, and the Indian boy told him to stop, and he wouldn't do it, so the Indian boy hit him, and then the Indian boy stepped back, and I tried to pull him off, and he started to fighting with me. As I was fighting with him, I happened to get the best of him,

and he reached in his pocket and got a knife. As I seen him pull a knife, I let him go and ran toward the S. P. track. The Indian boy then said something to him and he chased him into the saloon. After he came out of the saloon he walked right over to Bessie, and the first stroke cut her on the left side of the neck. He then started to walk away, and I don't know where they caught him, but I guess somewhere up here.

"Q. Did you see Jose strike Bessie with the knife? A. Yes, sir.

"Q. How many times, as near as you remember? A. Well, I seen the first stroke, and then he grabbed her around the neck and made several strokes. I do not know how many."

Witness Odell was asked:

"How many times did you hit him (the defendant)? A. I don't remember, but I hit him several times in the face."

A conviction of murder in the first degree was the result of the trial, and, the jury having failed to designate the punishment, the court sentenced the defendant to death by shooting.

A statement of defendant's counsel, made to the jury before the presentation of his case, is significant, inasmuch as it may have some bearing on the principal assignments of error. In part, it is as follows:

"If the court please, and gentlemen of the jury, we are not taking the position that this man should not be punished for the crime. We are not attempting to prove that this man is not guilty of killing Bessie Andy, and we are not going against the rules and laws of our social life so far as to say that you should not punish Joe Salgado for killing Bessie Andy. But we have disagreed with the state in this only: That he is not guilty of murder in the first degree, but, under the circumstances of this case, we expect to make it clear and plain to you gentlemen that he is guilty of a lesser crime, and that is why we are asking you to try him—to fix his punishment as will meet the circumstances. Therefore, understand us, gentlemen,

because we are in this courtroom and defending this case, we are not putting the county of Elko to the expense of trying this man because we contend that he is not guilty of a crime, but we are putting the county of Elko to the expense merely because we conscientiously believe that this man is not entitled to the most extreme punishment of the law, and therefore we will ask you, after we have shown to you to the best of our ability the circumstances surrounding this case, to take the law and the instructions of the court, or the evidence and the instructions of the court, and weigh everything carefully, and do with Joe Salgado as you think ought to be done."

The principal assignment of error relied upon by the appellant charges the trial court with error for having denied the defendant's challenge to the juror F. R. Jacoby. The defendant challenged the juror "for actual bias," and in this respect we deem it sufficient to say that the juror, by his answers to interrogatories propounded to him, signified that he had read of the case and had talked to several people with reference to the case; that from what he had read and heard he had formed and had expressed an opinion going to the merits of the case. It appears that none of the parties with whom he had conversed witnessed the homicide. His condition of mind with reference to the case is set forth in the following:

"Q. Well, right now then you have an opinion as to whether this man be guilty of murder in the first degree, or otherwise, haven't you? A. I have.

"Q. And if you sat as a juror on this case right at the outset of the trial one of the parties would be under a disadvantage in your mind, wouldn't they? A. Yes. sir.

"Q. It would require a certain amount of testimony to remove that disadvantage from your mind? A. It would."

He further stated:

"I mean at the present time I have what you may call a fixed opinion, but, if the evidence disagreed with the opinion that I have formed and what I have read, I could change my opinion."

In response to questions propounded by the court, the

juror answered that he could, if accepted as a juror, lay his opinion aside and try the case on the evidence presented at the trial. In view of the form of the objection interposed, the substance of the answer given by the juror Jacoby and the statements made by him are not subject to the same consideration as they would be if the objection had assumed another form.

[1] The statute relative to this subject provides that a challenge for cause may be taken by either party relative to a particular juror, for reasons:

First: General; *i. e.*, that the juror is disqualified from serving in any case by reason of his having been convicted of a felony; for want of any qualifications prescribed by law; or is of unsound mind or has physical defects which would render him incapable of performing the duties of juror.

Second: Particular; *i. e.*, that he is disqualified from serving in the action on trial. (Rev. Laws, secs. 7145, 7146.)

Particular causes of challenge are by our statute divided into classes: First, such a bias as, when the existence of the facts is ascertained, in judgment of law, disqualifies the juror—designated implied bias; second, such a state of mind on the part of the juror as leads to a just inference, in reference to the case, that he will not act with entire impartiality—designated actual bias. (Rev. Laws, sec. 7147.)

Section 7150 of our Revised Laws prescribes how a challenge for either implied or actual bias may be taken. It is as follows:

"In a challenge for implied bias, one or more of the causes stated in section 298 must be alleged. In a challenge for actual bias, it must be alleged that the juror is biased against the party challenging him; but no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon public rumor, statements in public press, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding

such an opinion, act impartially and fairly upon the matters submitted to him."

Under our former procedure, a challenge for actual bias required that the court should appoint triers to determine it. The new procedure adopted in 1912 did away with the process of determination by triers, and made the court the forum in which both implied bias and actual bias should be determined. It is unnecessary for us to determine in this instance as to the qualification of the juror as disclosed by his answer made on *voir dire,* nor is it essential that we pass upon the question of implied bias, inasmuch as the challenge was not for implied bias, but intended rather to constitute a challenge for "actual bias."

Under our former practice act, where triers were required to determine the truth or falsity of a challenge, it was essential that the challenge, when made, should conform to the statutory prescription. The change of the forum by which the challenge should be determined, from triers, as formerly prescribed, to the court, as under the new procedure, did not, in our judgment, in any way change the force and effect of the statute as to the essential grounds upon which the challenge should be based, or the essential form of the challenge. The statute in that respect remains the same as that formerly in force, the ground being, as prescribed: "The existence of a state of mind on the part of the juror which leads to a just inference, in reference to the case, that he will not act with entire impartiality"—the form of the challenge being, at least in substance, as prescribed by statute, "that the juror is biased against the party challenging him."

The mere assertion, "Challenge the juror for actual bias," fails to state any ground upon which the challenge rests or by reason of which it is made, or as to the party against whom he is biased, and hence the requirements of the statute are not followed, and no statutory challenge is interposed. (*People* v. *Hopt,* 3 Utah, 398, 4 Pac. 250; *Robinson* v. *Territory,* 16 Okl. 241, 85 Pac. 451.) In the

case of *People* v. *Hopt, supra,* the Supreme Court of Utah passed upon the question here under consideration, and in the light of a statute identical to ours, and under almost identical conditions. To the same effect is the case of *State* v. *Gordon,* 5 Idaho, 297, 48 Pac. 1061. This question was passed upon in an early decision by the Supreme Court of California under a statute similar to our former practice act requiring triers, and the reasoning there set forth we deem applicable to this case. (*People* v. *Reynolds,* 16 Cal. 130.) It has repeatedly been held by this court that a challenge for implied bias which fails to state one or more of the statutory grounds as a basis for challenge is insufficient. (*State* v. *Raymond,* 11 Nev. 98; *State* v. *Vaughan,* 22 Nev. 296, 39 Pac. 733; *State* v. *Gray,* 19 Nev. 212, 8 Pac. 456; *State* v. *Simas,* 25 Nev. 449, 62 Pac. 242.)

The determination of the question of actual bias being by our more recent practice left with the court, the same forum as that to which the question of implied bias is submitted for determination, the reasoning which was followed by this court on the question of the sufficiency of a challenge for implied bias should, in our judgment, warrant us now in holding, as was held by the Supreme Court of Utah in the case of *People* v. *Hopt, supra,* that, in order for the challenging party to raise any point for the consideration of the court, there must be a declaration of cause substantially complying with the provisions of the statute, and the form of the challenge must be in substantial compliance with that prescribed by statute; *i. e.,* "that the juror is biased against the party challenging."

The challenge was insufficient in form; and, while it does not appear from the record as to whether the court denied the challenge for this reason, or because he deemed the juror free from objection, the ruling must be sustained for failure to declare a ground of challenge known to the statute. (*State* v. *Vaughan, supra; Robinson* v. *Territory,* 16 Okl. 241, 85 Pac. 451; *State* v. *Myers,* 198 Mo. 248, 94 S. W. 242.)

[2] From the record in this case with reference to the *voir dire* examination of the juror Jacoby, it appears that, if he was disqualified at all, it was only such a disqualification as would subject him to a challenge for implied bias, and was not such as would in any way subject him to a challenge for actual bias. He was not challenged on the ground of implied bias; hence it is unnecessary for us to deal with that phase; suffice it to say that, had a challenge for implied bias been interposed to the juror Jacoby, the trial court, following the rule laid down by this court in the case of *State* v. *Roberts*, 27 Nev. 449, 77 Pac. 598, would have been required to allow the challenge and excuse the juror.

Assuming that the challenge interposed had been made in substantial compliance with the statute, we find nothing in the examination of the juror which would indicate to our mind that he was subject to such a challenge; hence, laying aside the question of the sufficiency of the challenge as to form, there was no error in the denying of the challenge on the issue made. Statements of the juror made on *voir dire* failed to disclose that he had ever known or seen the defendant. In fact, the defendant was a man who was apparently but little known in the community. The juror's answers disclosed nothing from which we may infer a personal feeling or bias toward or against the defendant or any one connected with the defense. He had read of the case, had heard the case talked of, had heard the matter of the killing of the Indian girl discussed, had entered into the discussion, perhaps, and from what he had read and heard he had formed an opinion. The parties with whom he had talked or who had discussed the incident in his presence were not witnesses to the killing. The opinion which he had he said was not fixed or set, but that he could lay it aside and determine the guilt or innocence of the defendant on the evidence produced at the trial. Having all of these disclosures as to the condition of the juror's mind with reference to the defendant, the party challenging, in view of the position taken by defendant as to

the commission of the act, and in view of the declaration of defendant's counsel made as a preliminary statement to the jury, it can scarcely be seriously contended that the court could have been successfully charged with error if it denied the challenge in the event that the same had been properly interposed.

[3-4] The appellant assigns error to the trial court for having permitted the state's witness McNamara to respond to a question calling for the apparent age of the dead girl. The objection to the interrogatory was upon the ground that it called for a conclusion, was incompetent, and immaterial. The age of the girl was not a material issue in the case, and hence, even if the contention of appellant was well founded, the error would be harmless, but, aside from that, the witness was a competent witness to express his opinion as to the age of the deceased, based upon his observations made at the time of the homicide. The relevancy of such testimony depends upon the nature of the issues being tried. If the issues were sharply drawn on the question of age, a different rule might apply, but that is not before us for consideration. Opinion evidence gains its sanction in the law by reason of the rule of necessity. No hard-and-fast rule has been promulgated by which evidence of this character may be judged. In cases where the age of a person is an issue, such as cases involving carnal knowledge of a female under the age of consent, the opinion of witnesses as to the age of the prosecutrix, based on their observation, has been held competent. (*Walker* v. *State,* 25 Tex. App. 448, 8 S. W. 644; *Bice* v. *State,* 37 Tex. Cr. R. 38, 38 S. W. 803; 17 Cyc. 98.)

[5] The witness Carter was permitted, over the objections of defendant's counsel, to testify as to a statement made by defendant a very short time after the stabbing. The statement testified to as having been made by defendant was in denial of the affair in which he said "Me no got a knife; me no cut." There is no contention that the testimony was not properly *res gestæ.* Utterances made by the defendant after the act of which he is accused,

which are intended to set up a false defense, are admissible in cases of this character as tending to show consciousness of guilt. (2 Wharton, Criminal Evidence, 1752, 1753; *Rex* v, *Steffoff*, 20 Ont. L. R. 103; *State* v. *Clark*, 160 Iowa, 138, 140 N. W. 821.)

[6] The evidence produced by the prosecution as to the act of the defendant in stabbing another man a few minutes before stabbing the Indian girl was properly received. It was directly a part of the main event in which the deceased lost her life, so closely connected as to be inseparable in a narrative as to the acts of the defendant at the time of the homicide. This evidence was admissible under the exception to the rule excluding evidence of collateral crimes, in that it was with reference to a contemporaneous crime, the circumstances surrounding which were, as we have said, essential to a sequential narrative of the main event.

[7] We find no error in the admission of the evidence as to the defendant having had in his possession a knife similar to the one found in close proximity to the scene of the homicide. Testimony as to the former possession of weapons similar to those found in possession of, or traced even by circumstantial evidence to, the defendant, is always admissible. Objection to this class of evidence is rather to its weight than to its admissibility. (2 Wharton, Criminal Evidence, 1748.)

[8] The knife received in evidence was identified as having been in the defendant's possession the afternoon . before the homicide, and the witness Odell identified the knife as being the one used by defendant when he stabbed the girl. No further identification was necessary for its admission in evidence. There is therefore no merit in appellant's contention in this respect.

We find no other assignments of error which we deem sufficiently important to require extended comment. The killing of the girl was admitted by counsel for defendant to the jury in his preliminary statement. Appellant only sought to have the punishment mitigated. While it was within the power of the jury to have returned a verdict

fixing the punishment at life imprisonment or one fixing
the punishment at death, they refused to do either, but
rendered their verdict fixing only the degree of the crime.
We find nothing in the record from which it might be
inferred that appellant received other than a fair trial, or
that a different result might flow from another trial.

The judgment is affirmed, and the court below is directed
to fix a time and make all necessary and proper orders for
having its sentence carried into effect by the warden of
the state prison.

TALBOT, C. J.: I concur.

NORCROSS, J., concurring:

I concur in the judgment and in the opinion generally
of Mr. Justice McCARRAN. There are, however, some
portions of the opinion of my learned associate, relative
to the rulings of the court below upon the objections to
the juror Jacoby, in which I am not entirely in accord.
The juror was first challenged upon the ground of "actual
bias," and later a further challenge was interposed upon
the ground "that the juror has answered that he has a
fixed opinion as to the guilt or innocence of this man."
It must be conceded that the challenges interposed were
not technically and strictly in the form prescribed by the
statute; yet I am of opinion that, had the examination of
the juror disclosed that he was disqualified either for
actual or implied bias, the right of the defendant to be
tried by a fair and impartial jury ought not to turn on
the mere technical form of the objection, where the form
of the challenge was not questioned by the court or
opposing counsel, and where the course of the examina-
tion of the juror indicated that a proper challenge was
assumed to have been made. A challenge for actual bias
should, as the statute prescribes (Rev. Laws, sec. 7150),
allege "that the juror is biased against the party chal-
lenging him." But should a failure to allege that the
bias is "against the party challenging" operate to make
the challenge unavailing, in the absence of objection to
its form, where the whole line of the examination of the

juror indicates that, if the juror is biased at all, it is against the party interposing the defective challenge, and that question is apparent to the court and the prosecuting attorney to be the one actually under investigation? I think not.

The same situation is presented with regard to the challenge interposed, "that the juror has answered that he has a fixed opinion as to the guilt or innocence of this man." Strictly and technically this challenge should have been for "implied bias," and the eighth clause should have been designated:

"(8) Having formed or expressed an unqualified opinion or belief that the prisoner is guilty or not guilty of the offense charged."

The examination of the juror discloses, however, that this was the question under investigation, and that neither the court nor the prosecution was misled by the form of the challenge. In *State* v. *Raymond*, 11 Nev. 107, this court, speaking through Hawley, J., regarded a "deliberate or fixed opinion" and an "unqualified opinion" as synonymous. See, also, *State* v. *Roberts*, 27 Nev. 449, 77 Pac. 598.

The tendency of modern decisions is to disregard technicalities. Judgments of conviction will not be disturbed for errors which do not affect the defendant's substantial rights. Certainly as much reason exists for supporting a rule that a defendant in a criminal case will not be held to have lost a substantial right because of any mere technicality in the form of an objection which has not misled the prosecution or the court in its ruling.

The examination of the juror Jacoby as to his qualifications was gone into quite thoroughly and at considerable length. From the whole examination it appears quite clear, I think, that the court did not err in denying the challenge either for actual or implied bias. While the juror, in answer to a question of counsel for the defendant, replied, "At the present time I have what you might call a fixed opinion," other portions of his examination

show clearly that he did not have a "fixed" opinion in the sense of an unqualified opinion. As further indicating the character of opinion entertained by the juror, the following excerpt is taken from the examination upon the part of the prosecuting attorney:

"Q. Then the opinion that you have is conditioned, is it not, upon what you have heard of the facts being true; that is, if what you have heard of the facts differs from the evidence here, the opinion which you have already formed you would entirely disregard, would you not? A. I would.

"Q. Now, would you to any extent as a juror be influenced by what you have heard of this case? A. I think not.

"Q. Do you feel that you could sit as a juror in this case and do equal justice to the state and to the defendant? A. I think so."

Also the following excerpt from the examination of the juror by the court:

"Q. Mr. Jacoby, if you should be accepted as a juror and sworn to try the case with the other eleven, would the opinion which you have at this time have any influence upon your verdict? A. No; I don't think it would.

"Q. Now, the important thing with you is: Could you and would you, if accepted as a juror, act with entire impartiality in this case? A. I think I would; yes, sir.

"Q. Well, do you feel sure that you could and would do that? A. I think so."

Also the following excerpt from the further examination of the juror by counsel for defendant:

"Q. Mr. Jacoby, wouldn't it be necessary for one side to introduce a certain amount of evidence to overcome that opinion? A. No; I don't think so. I think if I sat as a juror I would give a decision strictly according to the evidence."

It nowhere definitely appears from the examination that the juror had formed or expressed an unqualified opinion. Such opinion as the testimony discloses the

juror had was clearly a qualified opinion based "upon public rumor, statements in public press, or common notoriety." It further quite clearly appears that, "notwithstanding such an opinion," the juror would "act impartially and fairly upon the matters submitted to him."

Assuming, as I do, that a sufficient challenge for implied bias was interposed, I cannot agree with the prevailing opinion that the challenge is good under the rule laid down by this court in *State* v. *Roberts,* 27 Nev. 449, 77 Pac. 598. The statute upon which the Roberts case was based has been materially modified since that decision. The only proviso existing in the statute at the time of the Roberts decision which operated to prevent the formation or expression of an unqualified opinion from becoming an absolute disqualification upon proper challenge was the following:

"That such unqualified opinion or belief shall not have been formed or expressed or based upon the reading of newspaper accounts of the transaction." (Cutting's Compiled Laws, 1900, sec. 4305.)

A reference to Rev. Laws, sec. 7150, quoted in the prevailing opinion, will show the change in the law made by the later statute.

## ON REHEARING

By the Court, NORCROSS, C. J.:

A rehearing was granted in this case in order that further consideration might be given to the following instruction:

" 'Irresistible passion,' as used in these instructions, means something more than mere anger or irritation. It means that at the time of the act the reason is disturbed or obscured by passion to an extent which might render ordinary men of fair average disposition liable to act rashly, or without due deliberation or reflection, and from passion rather than judgment.

"Nor will irresistible passion, if proved to have existed, be sufficient to reduce the degree of the offense where

the killing was done with express malice, as heretofore defined; under our statute express malice necessarily renders any murder, murder of the first degree.

"And if the jury should find from the evidence the existence of facts and circumstances establishing beyond a reasonable doubt that the defendant had such a reckless disregard of human life as necessarily included a formed design against the life of Bessie Andy, the killing, if it amounts to murder, would be on express malice, and consequently would be murder of the first degree."

In the former opinion in this case this instruction was not considered. A more extended examination of the instruction, with a view to its bearing upon the peculiar facts of this case, convinces us that it is both erroneous and prejudicial.

The court had previously instructed the jury, in the language of the statute, that:

"Murder is the unlawful killing of a human being, with malice aforethought, either express or implied.

"Express malice is that deliberate intention unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof.

"Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart."

The jury was also instructed as follows:

"In cases where the unlawful killing is not perpetrated by means of poison, or lying in wait, or torture, or in the perpetration, or attempted perpetration, of any of the enumerated felonies, a difficulty is sometimes experienced in drawing the distinction between murder of the first degree and murder of the second degree; but this difficulty is more apparent than real, and that there may be no confusion in the minds of the jury I will briefly restate the distinction. The real test to be applied in such cases is the presence or absence in the mind of the slayer, at the time of the commission of the murder, of a deliberate and premeditated intent to kill. In order to constitute

murder of the first degree, the unlawful killing must be accompanied by a deliberate and clear intent to take life. The intent to kill must be the result of deliberate premeditation. It must be formed upon preexisting reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation."

The expression, "irresistible passion," was used in none of the instructions given, excepting the one quoted *supra.* The expression appears in two rejected instructions, one of which dealt with the law of manslaughter. Reading the definitions of "irresistible passion" and "express malice" into the instruction, we may have, as a resultant, something like this: Nor will the fact that the killing was done "without due deliberation," if proven so to have been done, be sufficient to reduce the degree of the offense if the killing was done with deliberate intention.

[9–14] It is contended that irresistible passion and express malice may coexist, and that the instruction is not fundamentally erroneous. For illustration, it is said that if A forms a deliberate design unlawfully to take the life of B, but that before A is able to carry out the preconceived design something intervenes to cause in A an irresistible passion, such subsequent aroused passion would not operate to reduce the degree of homicide. It might be sufficient observation upon the illustration to say that in such a case it would be proper to instruct the jury that the subsequent irresistible passion would not operate to change the previously formed deliberate design, so as to effect a substituted and different causation for the killing. Under such a state of facts, it would be the duty of the court to instruct with reference to such facts so that the jury would not be confused. No such facts are presented in this case, and we need only consider what we think to be true as a general proposition of the law of homicide, to wit, that irresistible passion and express malice cannot coexist. If irresistible passion is "proven to have existed," the homicide could not have been committed with express malice, and it could not be murder of the first degree. Authority exists in support of the proposition that implied malice and sudden passion may

coexist, in which case the offense is not reduced to the grade of manslaughter. As was said in Wharton on Homicide, 3d ed. sec. 163 :

"If malice existed, the crime is murder, and not manslaughter, though sudden passion coexisted and the homicide was the product of both. * * * If the provocation is inconsiderable, the law implies malice, and the homicide is murder; if it is great, malice will not be inferred, and it will be deemed to be manslaughter."

In *Commonwealth* v. *Eckerd*, 174 Pa. 137, 34 Atl. 305, it was held, in effect, that passion, even though sudden, must be upon sufficient provocation to repel the implication of malice. In *Brewer* v. *State*, 160 Ala. 66, 75, 49 South. 336, it was held that where the evidence showed that the defendant acted with malice, the fact that such malice may be accompanied with passion or anger aroused by deceased will not reduce the offense to manslaughter. See, also, *Bohanan* v. *State*, 15 Neb. 209, 18 N. W. 129; *State* v. *Ashley*, 45 La. Ann. 1036, 13 South. 738; *State* v. *Johnson*, 23 N. C. 354, 35 Am. Dec. 742. While malice and passion may coexist and a homicide be the result of both, "express malice" and "irresistible passion," as those terms are defined in the statute, cannot coexist. In express malice there is premeditation and deliberation, which are wanting in irresistible passion. As said in *Nye* v. *People*, 35 Mich. 19, it would be a "perversion of terms to apply the term 'deliberate' to any act which is done on a sudden impulse."

See, also, *Brown* v. *Commonwealth*, 86 Va. 466, 10 S. E. 745.

The instruction complained of in this case not only erroneously assumes that irresistible passion and express malice may coexist, but that if they do coexist, the element of express malice renders the killing murder in the first degree. The proposition of law that express malice, if determined to exist, renders the killing murder of the first degree, taken by itself, may be conceded to be a correct statement of the law. Taken in connection with the other part of the instruction, it renders the whole instruction confusing, contradictory, erroneous, and prejudicial. If the facts shown by the evidence were in

this case sufficient in the minds of the jury to cause in the defendant a heat of passion insufficient to reduce the crime to manslaughter, but sufficient to prevent the killing from being with that deliberate premeditation required to constitute murder in the first degree, it would be the duty of the jury to bring in a verdict of murder in the second degree. (21 Cyc. 732.) The evidence was such in this case as to make it of the greatest importance to the defendant that the jury be correctly instructed upon the law of murder in the first and in the second degree. Defendant had taken Bessie Andy, the deceased, and the father and mother of the latter to a Thanksgiving Day dinner at a Chinese restaurant and, having finished the dinner, were on their way to the Indian camp which was the home of the father and mother of the deceased, when they met the white man, Odell, and the half-breed Indian or Mexican. Prior to this meeting there is nothing to indicate but that the relationship between defendant and the Indian girl, Bessie Andy, was the most cordial. The defendant testified that he had been living with Bessie Andy for several years previous in the relation of husband and wife. When they met the other parties on the street some casual words of greeting were spoken. Then something was said in the Indian language by Bessie Andy to the half-breed and by him to her. What the conversation was does not appear from the testimony of the state's witnesses. The defendant testified that the half-breed wanted Bessie to go with him to Golconda, and threatened that if she did not do so he would kill Bessie and the defendant. Whatever this conversation was, it caused defendant to become suddenly enraged and to make a violent assault upon Bessie Andy. He knocked her down with his fist, and was beating her when Odell and the half-breed interfered in her behalf. Odell testified that the half-breed struck defendant, and that he also struck defendant several times in the face; that he had his arm around defendant's neck and was hitting him when defendant drew his knife from his

pocket. Odell and the half-breed then ran. Defendant chased the half-breed into a nearby saloon and stabbed him. Immediately thereafter he came out of the saloon to where Bessie Andy was standing and stabbed her to death. The whole proceeding did not exceed a minute or two in time. From a relationship apparently of the most friendly character a change suddenly takes place, and within a few seconds or minutes defendant kills one with whom he has been most intimately associated for years. There can be no doubt of defendant's being in passion. The degree of that passion as affecting deliberation and premeditation was a matter for the jury to consider in determining the degree of guilt from instructions clearly defining the law of murder in its different degrees.

[15–16] The last paragraph of the instruction in question we think also objectionable and in a case like this, without further elucidation, liable to be misleading. The paragraph appears to be adopted from a note in 21 Cyc. 731, and is based on an instruction given in the case of *Burt* v. *State,* 38 Tex. Cr. R. 397, 40 S. W. 1000, 43 S. W. 344, 39 L. R. A. 305, 330. The circumstances of the killing as disclosed by the evidence in the Burt case would necessarily establish a formed design, and of itself be conclusive proof of express malice in a sane person. The defense in the Burt case was insanity. If sane, the circumstances of the killing precluded every other consideration but first degree murder. For illustration, if a homicide is committed by binding and weighting the body, then throwing the same into water so death is necessarily produced by drowning, the method of accomplishing death conclusively establishes a formed design against the life of the deceased. Where death is produced by the common methods of stabbing or shooting, unless accompanied by other peculiar circumstances, the mere fact of stabbing or shooting would not of itself preclude other considerations negativing a formed design against the life of the deceased.

For the reasons given, the judgment is reversed, and the cause remanded for a new trial.

COLEMAN, J.: I concur.

MCCARRAN, J., dissenting:

I dissent.

The instruction, the giving of which is assigned as error, is as follows:

" 'Irresistible passion,' as used in these instructions, means something more than mere anger or irritation. It means that at the time of the act the reason is disturbed or obscured by passion to an extent which might render ordinary men of fair average disposition liable to act rashly, or without due deliberation or reflection, and from passion rather than judgment.

"Nor will irresistible passion, if proven to have existed, be sufficient to reduce the degree of the offense where the killing was done with express malice, as heretofore defined; under our statute express malice necessarily renders any murder, murder of the first degree.

"And if the jury should find from the evidence the existence of facts and circumstances establishing beyond a reasonable doubt that the defendant had such a reckless disregard of human life as necessarily includes a formed design against the life of Bessie Andy, the killing, if it amounts to murder, would be on express malice, and consequently would be murder of the first degree."

It is the contention of appellant that the trial court, in the giving of this instruction to the jury, instructed them upon a physical and mental impossibility. In other words, appellant contends that express malice and irresistible passion cannot be coexistent in the mind of a human being; and we are referred to some authorities holding that there cannot be an irresistible passion and express malice coexisting. Although there is some diversity of opinion on the subject, the weight of authority and, in my judgment, the better reasoning, support the proposition that malice and irresistible passion may coexist. In the case of *People* v. *Lilley*, 43 Mich. 521, 5 N. W. 982,

it was held that where the provocation is slight, or where there is time for the passion to subside and the blood to cool, or if there is evidence of actual malice, or if the provocation be resented in a brutal and ferocious manner, evincing a malignant disposition—in all such cases, if death ensue, the offense is murder.

"To reduce the offense to manslaughter," says the court, "all these things must be wanting, and the act must be done while reason is obscured by passion, so that the party acts rashly and without reflection."

In the case of *Brewer* v. *State*, 160 Ala. 66, 49 South. 336, it was held that where a killing was wholly the result of passion and without malice it was manslaughter; but where the killing was malicious and unlawful, the mere presence of passion and anger would not reduce the crime to manslaughter. In the case of *State* v. *Ashley* the Supreme Court of Louisiana said: "The proposition advanced—that, because a homicide is committed in sudden passion, therefore, necessarily, it is not murder—is not law. There are many cases where that fact would entitle an accused neither to an acquittal nor to a verdict of manslaughter." (*State* v. *Ashley*, 45 La. Ann. 1036, 13 South. 738.)

To the same effect is *Brooks and Orme* v. *Commonwealth*, 61 Pa. 352, 100 Am. Dec. 645. In the case of *Bohanan* v. *State*, the Supreme Court of Nebraska, in passing upon a requested instruction to the effect that if the killing were done "upon a sudden quarrel, and in the heat of passion, they should find the defendant guilty of manslaughter only," said: "This was refused, and properly, too, for the reason that it ignored completely the effect of malice if that were found to have accompanied the act. A malicious killing, although upon sudden quarrel, and in heat of passion, is murder in the second degree, at least." (*Bohanan* v. *State*, 15 Neb. 209, 18 N. W. 129.)

In the case of *Commonwealth* v. *Eckerd*, 174 Pa. 137, 34 Atl. 305, the Supreme Court of Pennsylvania held to the effect that the fact that the killing was done in sudden

passion does not prevent it being murder in the first degree, if the evidence disclosed that malice was also present in the mind of the slayer. In the case of *State* v. *Johnson*, 23 N. C. 354, 35 Am. Dec. 742, the court held, in effect, that provocation never disproves malice; it only removes the presumption of malice which the law raises without proof, and a malicious killing is murder, however gross the provocation. In a treatise on the Law of Crimes, by Clark and Marshall, the authors hold that in no case will an assault, however violent, mitigate the the offense if at the time of the commission of the offense there was malice in the mind of the perpetrator.

"And malice may well be inferred," say the authors, "if the retaliation was outrageous in its nature, either in the manner or the circumstances of it, and beyond all proportion to the provocation, 'because,' as it has been said, 'it manifests rather a diabolical depravity than the frailty of human nature.'" (Clark and Marshall on the Law of Crimes, 356.)

"If malice existed," says Mr. Wharton in his work on Homicide, "the crime is murder, and not manslaughter, though sudden passion coexisted and the homicide was the product of both." (Wharton on Homicide, 3d ed. 259.)

In *State* v. *Newton*, 28 La. Ann. 65, the court held that it was not error for the trial court to refuse to instruct, in a prosecution for homicide, that:

"Malice excludes passion; passion presupposes the absence of malice. In law they cannot coexist."

In the case of *Martin* v. *State*, 119 Ala. 1, 25 South. 255, the court held that homicide might be committed in the heat of passion suddenly aroused by a blow, and yet be done maliciously; that suddenly aroused passion and malice may coexist, and both cause the act; that when this is the case the homicide, otherwise indefensible murder, is not reduced to manslaughter by reason of the passion. To the same effect is the holding in *Ex Parte Brown*, 65 Ala. 446; *Jackson* v. *State*, 74 Ala. 26; *Prior* v. *State*, 77 Ala. 56; *Hawes* v. *State*, 88 Ala. 37, 7 South. 302; *Reese* v. *State*, 90 Ala. 624, 8 South. 818;

*Hornsby* v. *State*, 94 Ala. 55, 10 South. 522. Our statute, in attempting to define the import of malice, sets forth:

" 'Malice' and 'maliciously' shall import an evil intent, wish or design to vex, annoy or injure another person. Malice may be inferred from an act done in wilful disregard of the rights of another, or an act wrongfully done without just cause or excuse, or an act or omission of duty betraying a wilful disregard of social duty." (Rev. Laws, sec. 6294, subd. 3.)

Murder, as defined by our statute, is the unlawful killing of a human being, with malice aforethought, either expressed or implied. (Rev. Laws, sec. 6384.) Our statute defines express malice as that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. In the case of *State* v. *Lopez*, 15 Nev. 408, this court, speaking through Mr. Chief Justice Beatty, held that under our statute express malice necessarily renders any murder murder of the first degree. In fixing the degrees of murder, our statute sets forth:

"Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." (Rev. Laws, sec. 6386.)

Manslaughter, as defined by our statute, is the unlawful killing of a human being, without malice express or implied, and without any mixture of deliberation. It must be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible, or involuntary, in the commission of an unlawful act, or a lawful act without due caution or circumspection. (Rev. Laws, sec. 6387.) Under the provisions of our statute, as I view them, the existence of express malice, when the same is proven to exist in the mind of the slayer at the time of delivering the falal blow, fixes the homicide as murder of the first degree.

Irresistible passion, such as is contemplated by our statute to reduce a homicide from murder to manslaughter, although aroused from different causes in different

individuals, may, however, spring into existence as a condition of mind on an instant's provocation. While this may also be true with reference to that condition of mind depicted by the term "malice," nevertheless, as a general proposition, malice may be, and usually is, a condition of mind brought about in the individual by a more prolonged train of thought. The term "malice" necessarily implies previous consideration. This previous consideration, however, may be one of but short duration or slight mental activity. It need not be a consideration running through days, nor hours, nor even minutes. It may arise and be fostered by the successive thoughts of the mind. It is a stream, so to speak, having its origin in the fountains of hatred and revenge. Hatred and revenge are the handmaids of anger.

The record in this case presents a series of acts on the part of appellant which, although taking place within a short interval of time, disclose a condition of mind on the part of appellant which, in my judgment, warranted the giving of such an instruction as that complained of here. Appellant and the deceased girl, Bessie Andy, had been for some years prior to the homicide consorting together in and about the town of Elko—commonly speaking, they were living together. Appellant is a Mexican; the deceased, Bessie Andy, was an Indian girl. On the evening of the homicide, appellant and the deceased, together with the father of the deceased and others, had partaken of a meal together at one of the restaurants in Elko. The record discloses that during the course of the meal they had partaken of some liquor.

Later, leaving the restaurant, they proceeded to cross the main street of the town of Elko, going northward toward the Indian camp. After crossing the railroad track which runs through the main street, the party of which appellant and the deceased girl were members met two Indians. After some conversation in the Indian language between the deceased, Bessie Andy, and one of the Indians, appellant attacked the deceased girl, threw

her into a mud puddle in the street, and was beating and abusing her when the other Indians interfered by attacking him; and in the course of the melee the appellant drew his knife and pursued one of the Indians across the street into the Pioneer saloon, at the entrance of which place appellant stabbed the Indian, and was continuing in his pursuit when intercepted by parties in the saloon. Some one in the saloon caught hold of him and turned him around; he passed out again through the door which he had just entered, and without a moment's hesitation rushed into the street, passing several persons in his course, and made directly for the deceased girl, and then and there plunged his knife into her body several times. The girl fell, and death ensued almost instantly. The appellant ran away from the scene of the crime, and when brought back to the scene of the murder, a few minutes later, denied that he was the party who stabbed the girl. The knife with which appellant had done the stabbing was later found some distance from the scene of the crime.

Whatever might have been the justification for his assault on the Indian, or whatever might have been the provocation for his anger toward the Indian who engaged in conversation with the deceased girl at the beginning of the trouble, his malice toward the girl was manifest when after throwing her into the mud puddle and beating her, and after having pursued one of the parties who assailed him into the saloon, he returned from the saloon and made directly toward the girl—the object of his first and his last malicious assault. That he knew upon whom he sought to reap vengeance, and recognized the party toward whom his malice was directed, is manifest from the fact that, of all the persons in and about the place and on the street in that immediate vicinity, he selected the girl to be the victim of his knife.

While I believe that the substance of this instruction and the law sought to be set forth therein might have been better given in another form, nevertheless, in view

of the evidence set forth in the record in this case, it is my judgment that no prejudice resulted to the appellant from the giving of this instruction.

In my opinion, the judgment of the lower court and the order denying the appellant's motion for a new trial should be affirmed.