# United States Court of Appeals
### For the Eighth Circuit

_____

No. 15-2924
_____

Madonna Massey-Diez

*Plaintiff - Appellant*

v.

University of Iowa Community Medical Services, Inc.

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Southern District of Iowa - Davenport
_____

Submitted: March 17, 2016
Filed: June 27, 2016
_____

Before MURPHY, BEAM, and GRUENDER, Circuit Judges.
_____

BEAM, Circuit Judge.

Madonna Massey-Diez, a physician assistant (PA) formerly employed by University of Iowa Community Medical Services, Inc. (UICMS), appeals the district

court's[1] adverse grant of summary judgment on claimed violations of the Family and Medical Leave Act of 1993 (FMLA). We affirm.

## I.    BACKGROUND

### A.    Massey-Diez's Failure to Adhere to UICMS's Charting Policies

Because this case comes to us on UICMS's motion for summary judgment, we portray the facts in the light most favorable to Massey-Diez. Loftness Specialized Farm Equip., Inc. v. Twiestmeyer, 818 F.3d 356, 360 (8th Cir. 2016). Massey-Diez began working for UICMS at its North Liberty, Iowa, clinic as a PA in September 2009 under a year-to-year employment contract. In 2011 UICMS adopted "EPIC," a software program used to manage patient records, track patient phone calls, review laboratory tests, and handle prescription refills. Promptly updating a patient's medical information on EPIC after the patient's visit (also known as "charting") is important for billing and for presenting providers with current information about the patient. In order to encourage prompt charting, UICMS employs nonbinding "Standards of Excellence," which require that dictation be done within 24 hours of a patient's visit and that once that dictation is transcribed, the transcription be reviewed and signed within the next 48 hours. The standards also require a patient's charting generally "be completed within seven days" of a patient's visit and that transcribed dictation in particular "be filed in the medical record within five working days of [a] visit."[2]

---

[1]The Honorable Stephanie M. Rose, United States District Judge for the Southern District of Iowa.

[2]The UICMS Executive Director and the district court described the Standards of Excellence as requiring that providers complete charting within 48 hours of a patient's visit. Massey-Diez does not dispute this characterization.

Apart from the Standards of Excellence, UICMS also requires that providers follow its "Completion of Documentation Policy," enforced through a disciplinary procedure. The policy defines a provider as "noncompliant" if he is responsible for thirty or more unsigned records that are, on average, fourteen or more days old. If a provider is noncompliant, he is subject to "Level 1" discipline, wherein he is formally notified of his noncompliance and given seven days to complete all delinquent charting. Failure to do so within the seven-day period subjects the provider to "Level 2" discipline, which consists of notice and paid leave until all delinquent charting is completed. Failure to complete all delinquent charting in fourteen days results in "Level 3" discipline, in which the provider's employment is suspended pending completion of all delinquent charting.

Massey-Diez by all accounts provided excellent patient care. She had difficulty, however, with promptly updating patient records on EPIC. Providers were scheduled in back-to-back blocks of time, each allotted to a scheduled patient. Providers were expected to both attend to the patient and complete their charting within that period or to complete the charting at another time. These blocks were not long enough for Massey-Diez to do both, and apparently she was unsuccessful in having the clinic adjust her schedule to address this issue. North Liberty clinic manager Heidi Hansen advised supervisors about Massey-Diez's issue with updating patient records in a timely fashion as early as July 2012. By that fall, Massey-Diez had over 200 delinquent records. In a November 2012 e-mail exchange Hansen wrote UICMS executive director Terry Protextor, assistant administrator Mike Hayden, and Massey-Diez's supervising physician Dr. Powers to express her "concern[] about Madonna and how far back her missing notes go." Dr. Powers replied to Protextor, Hayden, and Hansen:

I was ready to address this head on today at Madonna's review, and then it was cancelled because of her not feeling well.

I am very concerned as her supervising physician. I am almost to the point where I would not want her on my license any longer. Not only should these notes have been done, but I should have been reviewing 10% of them.

I was going to propose a probationary period (? How long) where she MUST complete these notes, while also continuing work at the clinic. If this fails, then I would suggest work suspension.

The overlying factors are her home and family stress. Yet, those problems are now vigorously spilling over into work. Not only with incomplete work, but with many missed days or 1/2 days.

. . . .

I really want to CC her on this email, but will not. Rather, Mike, Heidi, and I should complete her review ASAP. Before then, we all need to come to consensus on how SHE will handle this problem.

Massey-Diez subsequently received a "below expectations" rating on a performance evaluation for prioritizing and completing work assignments on time. She received notice of Level 1 discipline on November 30, 2012, and notice of Level 2 discipline in early December. Sometime in December, she caught up on her charting. She fell behind again the following February 2013. On March 21 she reached Level 2 discipline for the second time.

Also on March 21, 2013, Massey-Diez attended a meeting with Protextor, Hayden, and Hansen. They discussed her tardy charting and agreed to try a new "open" scheduling method that might give Massey-Diez the opportunity to complete charting between patients. The meeting minutes describe some "Take-aways": "1) by the end of next week notes have to be caught up so you are w/in 48 hours to current"; and "2) For 90 days stay current (gave exception for outliers). Expectation is the UICMS standard of 48 hours." Additionally, a "Counseling & Disciplinary

Action Report" signed by Massey-Diez stated: "Expectation is that charting will be current within one week and kept current for the next 90 days. If Madonna is not compliant with this then contract may not be renewed." Massey-Diez testified that she did not leave that meeting with the understanding that the renewal of her contract was in jeopardy and that she believed that during the 90-day period her objective was to stay in compliance with the Completion of Documentation Policy, rather than the 48-hour standard. In an April 3 e-mail, however, Massey-Diez described her "knowing there is no intent to renew my contract in September." In another, April 15, e-mail, she described the subjects discussed at the March 21 meeting as including "48 hour turnaround on notes, [and] intent to not renew my contract in September." Massey-Diez caught up on her charting, but she fell behind once more in May and June of 2013.

**B.      Massey-Diez's FMLA Leave and UICMS's Decision Not to Renew Her Employment Contract**

On June 17, 2013, Massey-Diez broke her foot and took FMLA leave for a serious medical condition. Her leave ran until June 30, at which point it became intermittent, and it ended on July 8. As of the date she took leave, she had as many as thirty-one incomplete charts that were five or more days old and so was in violation of the 48-hour turnaround time agreed to in the March 21 meeting. At that time, however, she was compliant under the Completion of Documentation Policy. While she was on FMLA leave, Massey-Diez was contacted for information on when she would return to work. She also was asked to attend to her EPIC inbox and the EPIC inbox of another employee named Savita from home. This included responding to patient phone calls, attending to prescription refills, sending messages, performing triage, and reviewing laboratory tests. Massey-Diez testified that at no point while on FMLA leave did she decline to perform the work requested of her nor did she express any reservations about doing so. Further, Massey-Diez testified that no one at UICMS stated or implied that her failure to comply with directives to work would result in an

adverse employment action. She also testified: "When they were asking me to do things from home, I basically did it because I felt like I had to"; and, "[I]t wasn't a question of will you do this. It was basically I need you to do this." On June 26, Massey-Diez came into the clinic for part of a day to see patients before her foot was fully healed.

The record presents the following specific communications between Massey-Diez and UICMS: On June 17, Hansen text messaged Massey-Diez to ask, at the suggestion of Dr. Powers, whether she would be able to see patients while she was on crutches. Massey-Diez indicated she could not. On June 21, Hansen text messaged Massey-Diez that she had heard from Dr. Powers that Massey-Diez may be back the next week. Massey-Diez replied that she planned to try but that she did not want to commit to doing so at that time. She also stated in her reply: "I have kept up with my inbox since I've been out. Hopefully this has helped the docs somewhat." Massey-Diez indicated that she hoped her time spent on her inbox and possibly transitioning back to part-time could offset her depletion of paid time off (PTO) while on FMLA leave so that she would retain some PTO to use to visit her family later that summer. Hansen suggested that Hayden may have some ideas for how Massey-Diez could return to work given her injury. Massey-Diez e-mailed Hayden that day:

> Heidi recommended I contact you as she said you had a couple of ideas on me possibly returning to work on Monday, part time if tolerated. I'm definitely open for suggestions.
>
> I have continued to handle my inbox and help with Savita's in box from home. Hopefully this has helped the docs in the clinic...
>
> I will be on and off EPIC today.

Hayden responded, suggesting she could either see patients on a part-time basis or in a modified exam room, "abstract" patient charts at her desk, or both. Massey-Diez did

-6-

not reply to this e-mail, and she testified that she objected to the fact "that he was even giving me the option to work while on FMLA. It's my understanding that that's not allowed."

On June 25 Massey-Diez and Hansen text messaged each other about Massey-Diez's coming in to work the morning of the 26th. Also on the 25th, Hayden e-mailed Hansen: "Heidi – looks like Madonna is behind. Can we let her know?" On the 26th Hansen wrote in an e-mail to Massey-Diez:

> You currently have nine notes that have not been done in EPIC which are prior to 6/12/13 and that you have received two notices to complete one note from 6/5/2013 of which you have received three notices to complete, and 21 incomplete notes (two notices sent) also prior to 6/12/13.
>
> Please get these completed ASAP as we are finishing the fiscal year.

The next day, June 27, Hansen text messaged Massey-Diez: "Hey. You've got numerous notes out there incomplete or missing. Last count was over 30 14 days or older. I've also received a list that the coder has requested 3 times. Can you please log in and take care if [sic] these?" On July 1, Hansen text messaged Massey-Diez: "Morning. We are going to be short staffed this week with Dr E filling in Wed and two QC PA's on Friday. Could I get you to log in and help with refills etc?" Massey-Diez indicated that she had been doing this. On July 5, Hansen text messaged: "Hey ya. We're [sic] you checking the inbox today?" Massey-Diez again replied that she was.

Massey-Diez was also in contact with Dr. Powers during this time. It was Dr. Powers who had diagnosed her broken foot, and while examining her he commented that her injury was one that could not be faked. Massey-Diez took the comment as a

hostile implication that she would fake an injury to get out of work. She also was told by a nurse that Dr. Powers had made the same comment to other staff members at the clinic. On June 20, 2013, Massey-Diez communicated to Dr. Powers that her hope was to return to work the following Monday, June 24. (This, presumably, prompted Hansen's June 21 text to Massey-Diez the next day.) On the morning of June 21, Dr. Powers text messaged her that the clinic was going to be busy that day and so she should stay up to date on her and Savita's inboxes. Dr. Powers testified that this text message from him appeared to be a directive. He acknowledged that he should not have been directing her to work but explained that he was not aware that she was entitled to be completely free of work duties, thinking she was only entitled to reduced responsibilities.[3] On June 25 and July 2, Dr. Powers again directed Massey-Diez to stay up on her and Savita's inboxes. Dr. Powers testified that the clinic was short staffed at the time, and both he and Hansen testified to feeling frustrated about the lack of providers impinging on the clinic's ability to deliver care to patients. Both Dr. Powers and Hansen informed Massey-Diez that the clinic was short staffed.

On June 28, Hansen sent the following e-mail to Protextor, Hayden, and Dr. Powers:

> Madonna has 18 charts with *no note* that are at least 14 days old. She has 17 charts with *incomplete* notes that are at least 14 days old.
>
> I sent her an email the other day asking her to complete them, I also sent her a text message mid-day yesterday saying she had numerous outstanding charts. Just out of curiosity I looked at the charts of the

---

[3]The record does not indicate whether, on June 21, Dr. Powers's text message to Massey-Diez directing her to work occurred before or after Massey-Diez's text message to Hansen stating that she was working on her and Savita's inboxes, but we will resolve this ambiguity in Massey-Diez's favor and assume that she performed this work at Dr. Powers's request rather than on her own initiative.

people she saw when she worked on Wednesday[, June 26,] and *none of the six patient* [sic] *she saw* have notes that are complete.

On or around July 2, Protextor, Hayden, and Dr. Powers discussed Massey-Diez's charting issues over a conference call and together decided that UICMS would not renew her contract, which was set to expire that coming September. At this meeting, Dr. Powers expressed his reservations about the accuracy of Massey-Diez's notes and his "feeling[] that [he] was losing confidence in her ability to maintain complete notes and that [he] was not comfortable with continuing as her supervising physician for that reason." Dr. Powers testified that there was not a specific discussion of any particular standard: "I don't remember discussing 20 charts versus 30 charts, 10 days versus 14 days. I don't remember that discussion at all, but I remember a discussion about just, once again, seeing a large number of incomplete charts." Testimony from Hayden and Protextor corroborates the lack of mention of a particular standard at the meeting. Hayden's testimony regarding the meeting is as follows:

> A conference call about Madonna's lateness in her charts, and Dr. Powers is concerned, as it–he's clearly stated from the–every time it's come up as an issue from November or October in 2012, he is concerned about his responsibility when she is noncompliant with her charting.
>
> So I think at that point there was a discussion on, you know, we talked to her about it before, she's taken time off, she's been–she has been–just continued to be noncompliant with this policy and even–she might get current, but then she just kind of is up and down like this (indicating) and I don't think we're going to renew her contract because of that. I think it was kind of a group discussion and what do we want to do about it and I don't think we can renew it.

Massey-Diez returned to work July 8, and she was informed by letter the next day that her contract would not be renewed. Massey-Diez met with Dr. Powers to discuss the decision not to renew her contract, and Dr. Powers gave as the reason for

the decision Massey-Diez's falling behind in charting for a third time, specifically mentioning that she was more than two weeks behind in her notes as of June 26. Massey-Diez pointed out that she was on FMLA leave, and Dr. Powers responded with a chuckle that she should have worked on her charting while she was on leave.

Massey-Diez brought three claims against UICMS: that it interfered with her exercise of rights provided her by the FMLA; that it discriminated against her for exercising those rights;[4] and that it failed to pay her wages for work done while on FMLA leave. The district court granted UICMS's motion for summary judgment on each of Massey-Diez's claims. It determined that Massey-Diez created no factual dispute as to whether she was coerced to work while on FMLA leave, whether UICMS failed to renew her contract because she took FMLA leave, and whether she was paid for work she performed while on FMLA leave. Massey-Diez appeals the dismissal of her interference and discrimination claims.

## II.    DISCUSSION

We review the district court's grant of summary judgment de novo, affirming if "the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact." Gazal v. Boehringer Ingelheim Pharm., Inc., 647 F.3d 833, 837 (8th Cir. 2011). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." Id. at 837-38. The FMLA entitles eligible employees (which Massey-Diez was) to twelve workweeks of leave per year for specified reasons, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C.

---

[4]Massey-Diez originally styled this as a "retaliation" claim under 29 U.S.C. § 2615(a)(2), but the district court determined it was more properly characterized as a § 2615(a)(1) "discrimination" claim and Massey-Diez does not dispute this.

-10-

§ 2612(a)(1)(D). It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise," an employee's rights under the FMLA. Id. § 2615(a)(1). Massey-Diez claims UICMS both interfered with her exercise of her right to take medical leave and discriminatorily refused to renew her contract for exercising that right.[5]

## A.    Interference

The theory of Massey-Diez's interference claim is that UICMS's directives to work, which Massey-Diez believed she had no choice but to comply with, interfered with her right under the FMLA to take leave. To prevail on an interference claim, an employee has the burden of proving that she was entitled to a benefit under the FMLA, that the employer "interfered with," i.e., denied the employee, that entitlement, and that the reason for denial was connected to the employee's FMLA leave. Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006). Even if successful on this front, a claim for interference will fail unless the employee also shows that the employer's interference prejudiced the employee as the result of a real, remediable impairment of her rights under the FMLA. Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89-90 (2002). The employer's intent is immaterial to an FMLA interference claim. Stallings, 447 F.3d at 1050. One way an employer interferes with an employee's entitlement to FMLA leave is by "discouraging an employee from using

---

[5]There appears to be an unresolved difference of opinion in our circuit as to whether the type of claim Massey-Diez asserts–that an adverse action by her employer was based in part on her exercise of rights under the FMLA–is actionable under § 2615(a)(1) or (a)(2). Compare Lovland v. Emp'rs Mut. Cas. Co., 674 F.3d 806, 811 (8th Cir. 2012), with Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1006 (8th Cir. 2012). The plain language of § 2615(a)(2) supports the district court's characterization of this claim as arising instead under § 2615(a)(1). Accord 29 C.F.R. § 825.220(c) ("The Act's prohibition against interference prohibits an employer from discriminating or retaliating against an employee . . . for having exercised . . . FMLA rights.").

such leave." 29 C.F.R. § 825.220(b).[6] But the FMLA does not prohibit "an employee's voluntary and uncoerced acceptance (not as a condition of employment) of a light duty assignment while recovering from a serious health condition." Id. § 825.220(d). Moreover, "[a]n employer may require an employee on FMLA leave to report periodically on the employee's status and intent to return to work." Id. § 825.311(a). Massey-Diez contends that UICMS's "continual[] and repeated[]" contact with her to inquire about when she would return and to "insist" she work at home denied her entitlements under the FMLA. UICMS responds that there is no dispute that Massey-Diez voluntarily accepted her duties while on leave and was not coerced into doing so.

At the outset, we note that 29 C.F.R. § 825.311(a) inarguably permitted UICMS to contact Massey-Diez to inquire about her "status and intent to return to work." As to UICMS's directives to work on the EPIC inboxes, the issue for review is whether UICMS coerced Massey-Diez into performing work duties while on FMLA leave or whether she voluntarily agreed to do so. Whether and under what circumstances an employer interferes with FMLA rights by contacting an employee on FMLA leave with a request to work is not a question we have addressed previously. Federal courts from other circuits, however, have taken the general approach of recognizing the right of the employer to contact an employee on FMLA leave for certain purposes but also recognizing that "asking or requiring an employee to perform work while on leave can constitute interference." Smith-Schrenk v. Genon Energy Servs., LLC, No. H-13-2902, 2015 WL 150727, at *9 (S.D. Tex. Jan. 12, 2015). For purposes of summary judgment, courts have drawn the line along a distinction between, on the one hand, receiving nondisruptive communications such as short phone calls requesting the

---

[6]The regulations cited in this opinion are a "part of the administrative structure the Secretary [of Labor] devised pursuant to Congress' directive  to issue regulations 'necessary to carry out' the [FMLA].  The Secretary's judgment that a particular regulation fits within this statutory constraint must be given considerable weight." Ragsdale, 535 U.S. at 86 (citation omitted) (quoting 29 U.S.C. § 2654).

employee to pass on institutional knowledge or property as a professional courtesy, and, on the other, requiring the employee to complete work-related tasks or produce work product. Compare O'Donnell v. Passport Health Commc'ns, Inc., 561 F. App'x 212, 216-18 (3d Cir. 2014) (affirming summary judgment on interference claim because e-mails requesting paperwork were "de minimis" and "did not require O'Donnell to perform work to benefit the company and did not materially interfere with her leave"), Sabourin v. Univ. of Utah, 676 F.3d 950, 961 (10th Cir. 2012) (same for requests that employee return equipment and data), Callison v. City of Phila., 430 F.3d 117, 121 (3d Cir. 2005) (same where employer enforced abuse-of-sick-leave policy by visiting employee's home), and Reilly v. Revlon, Inc., 620 F. Supp. 2d 524, 535-37 (S.D.N.Y. 2009) (granting summary judgment where employee merely fielded brief telephone calls as a "professional courtesy" and did not "produce any work product" or "complete any assignments during her leave"), with Smith-Schrenk, 2015 WL 150727, at *10 (denying summary judgment where employer "continued assigning [employee] work" during FMLA leave), Franks v. Indian Rivers Mental Health Ctr., No. 7:08-cv-1035-slb, 2012 WL 4736444, at *16-17 (N.D. Ala. Sept. 30, 2012) (same where fact issue remained whether employer "ask[ed] or require[d Franks] to perform work-related tasks during her FMLA leave period"), and McConnell v. Swifty Transp., Inc., No. 2:04-cv-0153, 2005 WL 1865386, at *7-8 (S.D. Ohio July 29, 2005) (same where employer called to ask employee to perform work-related tasks and twice visited employee).

Anything to the contrary within this persuasive authority notwithstanding, the record construed in Massey-Diez's favor demonstrates that although UICMS did direct her to complete work-related tasks from home, undisputed, material facts exist that entitle UICMS to judgment as a matter of law. It is uncontroverted that Massey-Diez never expressed reservations to UICMS about performing work on the EPIC inboxes while on leave. More than this, she was proactive in seeking ways in which to prevent depletion of her PTO. She wrote Hayden stating she was "open for suggestions" on ways in which she might be able to come into work. Additionally, she attempted to

-13-

come into work one day to see patients. Although Dr. Powers suggested to Hayden that Massey-Diez could use crutches to see patients, and although Hayden made this suggestion to her, Massey-Diez stated she would not. The record does not contain any further communications from anyone at UICMS suggesting, let alone requesting, she come into the clinic. It appears, therefore, that her decision to come into work on June 26 was made on her own initiative and not at UICMS's request. We decline to adopt the position that the act of contacting Massey-Diez to direct her to attend to inboxes and suggest she see patients on crutches, without more, mechanically raises an issue sufficient to survive a motion for summary judgment with no corresponding factual dispute as to whether those communications were coercive or whether she engaged in work involuntarily.

This is consistent with FMLA regulations that permit voluntary and uncoerced acceptance of work by employees on medical leave, so long as acceptance is not a condition of employment. Those regulations permit "an individual employee on unpaid leave [to] return[] to work quickly by accepting a 'light duty' or different assignment." The Family and Medical Leave Act of 1993, 60 Fed. Reg. 2180, 2218-19 (Jan. 6, 1995) (codified at 29 C.F.R. Part 825). Although Dr. Powers's and Hansen's directives approach the line of interference set out in the above cases, Massey-Diez has not presented evidence that UICMS's requests were a condition of her employment nor that her compliance with them was anything but voluntary.[7] Affording considerable weight to the Secretary of Labor's determination of what the FMLA requires, we conclude that the evidence does not permit a reasonable jury to find that UICMS interfered with Massey-Diez's right to FMLA leave. Cf. Bacon v. Hennepin County Med. Ctr., 550 F.3d 711, 715 (8th Cir. 2008) (affirming summary

---

[7]Massey-Diez's testimony that she subjectively felt she had no choice but to comply with UICMS's requests, without any outward manifestation of that feeling communicated to UICMS or stronger demands on its part than what appears in the record, does not create a genuine dispute as to coercion and involuntariness.

-14-

judgment in reliance on FMLA regulations). Therefore, UICMS was entitled to summary judgment on Massey-Diez's interference claim.[8]

## B.     Discrimination

Massey-Diez also claims that UICMS refused to renew her contract because she took leave and thereby discriminated against her based on her exercise of her FMLA rights. Her theory is that UICMS determined her charting was tardy by including in its count days on which she was on FMLA leave. Massey-Diez is of course correct that UICMS would not be permitted to do this, as employees on FMLA leave are entitled to be free of work responsibilities. Because Massey-Diez was compliant under the Completion of Documentation Policy when she took leave, an adverse employment action justified by failure to adhere to that policy while she was on leave would necessarily violate the FMLA.

Unlike a claim for interference under the FMLA, a discrimination claim rests on a connection between an adverse employment action and an illegal motive on the part of the employer. Pulczinski, 691 F.3d at 1006. In the absence of direct evidence of such a connection we have imported the burden-shifting framework from Title VII cases set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). E.g., Brown v. City of Jacksonville, 711 F.3d 883, 891 (8th Cir. 2013).

### 1.     Direct Evidence

Massey-Diez argues that direct evidence of discrimination exists because "[t]he sequence of events surrounding [her] use of FMLA leave in this case establish[es] a specific link between her taking leave and UICMS's ultimate decision not to renew her

---

[8]Because we affirm summary judgment on this ground, we need not address UICMS's argument as to prejudice.

contract." "Direct evidence provides a strong causal link between the alleged discriminatory bias and the adverse employment decision." McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 861 (8th Cir. 2009). Direct evidence may be circumstantial if the inferred causal link is strong enough. Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). The bias, however, must be that of the decision maker and must relate to the decisional process. Doucette v. Morrison Cty., Minn., 763 F.3d 978, 986 (8th Cir. 2014).

Massey-Diez argues the following constitutes direct evidence of discrimination: (1) UICMS's inquiries and requests that Massey-Diez work; (2) Hansen's and Dr. Powers's admitted frustration at understaffing; (3) Massey-Diez's coming in to work on June 26; (3) Hansen's instruction to complete late charting "ASAP" and her follow-up text message sent the next day; (4) various references to the Completion of Documentation Policy standard (thirty or more notes averaging fourteen or more days behind); (5) the four-day gap between Hansen's June 28 e-mail to Protextor, Hayden, and Dr. Powers, and their July 2 decision not to renew her contract; and (6) Dr. Powers's comment that Massey-Diez should have completed charting while on leave. Massey-Diez does not cite any case finding direct evidence of discrimination on similar facts.

Cases finding direct evidence of discrimination usually involve statements or actions more blatant than anything presented in this case. Cf. Duckworth v. St. Louis Metro. Police Dep't, 491 F.3d 401, 406 (8th Cir. 2007) (finding e-mail stating "'I believe there is a definite need for female officers on the nightwatch'" direct evidence of gender-based discrimination); Browning v. President Riverboat Casino-Mo., Inc., 139 F.3d 631, 635 (8th Cir. 1998) (finding use of racial slur by supervisor direct evidence of race-based discrimination). Nothing so clear connects UICMS decision makers and their decision-making process with an illegal motive. References to Massey-Diez completing charting while on leave should be viewed in the context of her voluntary agreement to attend to her EPIC duties, as should UICMS's other

-16-

communications. There is no evidence that UICMS requested Massey-Diez to come into work on June 26. There is not direct evidence imputing any alleged bias on Dr. Powers's and Hansen's parts to Protextor and Hayden or the group's decision not to renew Massey-Diez's contract. The record discloses that the meeting addressed a general concern with Massey-Diez's repeated failures to keep timely records and the effect that had on Dr. Powers's confidence in her. Although Hayden, in his testimony about that meeting, does reference Massey-Diez having taken time off, we do not find that this isolated statement amounts to a strong enough showing of discriminatory intent to amount to direct evidence. Hansen's June 28 e-mail to other supervisors was sent shortly after completion of the 90-day probationary period when review was warranted, mitigating any implications from its timing, and that e-mail merely points out that Massey-Diez was behind on charting without directly invoking the Completion of Documentation Policy standard. While Hansen's June 27 text to Massey-Diez did make mention of that standard, Hansen was not involved in the decision to not renew Massey-Diez's contract. We agree with the district court that the sequence of events alone does not give rise to a causal link between UICMS's alleged discriminatory motive and its decision not to renew Massey-Diez's contract strong enough to permit her to forgo the burden-shifting framework.

## 2. Circumstantial Evidence

Massey-Diez also argues circumstantial evidence establishes discrimination. We apply the McDonnell Douglas framework to discrimination claims where the employee attempts to prove improper motive through circumstantial evidence:

> First, the employee must establish a prima facie case of retaliatory discrimination by showing that "she exercised rights afforded by the Act, that she suffered an adverse employment action, and that there was a causal connection between her exercise of rights and the adverse employment action." Second, once the employee establishes a prima facie case, the burden shifts to the employer to artic[ulate] a legitimate,

-17-

nondiscriminatory reason for its actions.  Finally, the burden shifts back to the employee to demonstrate that the "employer's proffered reason is pretextual."  The employee must present evidence that "(1) creates a question of fact regarding whether [the defendant's] reason was pretextual and (2) creates a reasonable inference that [the defendant] acted in retaliation."

Hite v. Vermeer Mfg. Co., 446 F.3d 858, 865 (8th Cir. 2006) (second and third alterations in original) (citations omitted) (quoting Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832-33 (8th Cir. 2002)).  The district court found that Massey-Diez failed to present evidence creating a dispute as to pretext.  Although UICMS contends that Massey-Diez also failed to create a dispute as to causation between the alleged bias and adverse action, we will assume without deciding that Massey-Diez has presented a prima facie case of discrimination and turn to the issue of pretext.

UICMS has proffered Massey-Diez's tardy charting as a nondiscriminatory justification for deciding not to renew her contract.[9]  Massey-Diez must present some evidence that this proffered reason is a pretext "by establishing that the employer's 'justification for the [adverse action] was unworthy of credence.'"  Id. at 867

_____

[9]UICMS contends that it is more accurate to view Dr. Powers's loss of confidence in Massey-Diez as the reason for nonrenewal, rather than the failure to meet any particular charting standard.  This is a distinction without a difference.  Dr. Powers's loss of confidence arose as a result of the tardy charting and the charting was considered tardy–according to UICMS's proffered legitimate justification–because she failed to comply with the conditions of her probationary period.  Dr. Powers's stated lack of confidence in the accuracy of Massey-Diez's notes arose from their tardiness: "I remember stating [at the July 2 meeting] that the longer notes are delinquent, and especially notes that aren't even started, I have a lot of reservation about the accuracy of the content of those notes."  UICMS has not presented any reason unrelated to tardy charting for Dr. Powers's loss of confidence.

(alteration in original) (quoting Smith, 302 F.3d at 833-34). A sufficiently strong prima facie case may itself establish pretext. Id. Massey-Diez can also show pretext

> by demonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies.

Stallings, 447 F.3d at 1052. Further, an employee can prove pretext "by persuading the court that a [prohibited] reason more likely motivated the employer" than did a concededly sufficient proferred justification. Id. (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

Massey-Diez argues first that "UICMS's stated reason that it did not renew Massey-Diez's contract because she continued to have delays in charting before taking FMLA leave is inconsistent with its own practice and policies" because the only system for discipline was the Completion of Documentation Policy, with which Massey-Diez was compliant as of the date she took leave. But this argument ignores the undisputed conditions of her 90-day probationary period agreed to in the March 21 meeting. Second, Massey-Diez argues that aside from charting, she was regarded as an excellent provider and her performance reviews reflect that fact. But of course this argument does nothing to undercut the credibility of UICMS's justification–that it was concerned about charting, an important aspect of running the clinic. She also points to references made to the Completion of Documentation Policy by UICMS supervisors, pointing out, correctly, that UICMS was not permitted to count days Massey-Diez was on leave in calculating how late her charting was. But all evidence in the record concerning the July 2 meeting shows that the Completion of Documentation Policy was not discussed. Massey-Diez, of course, bears the burden

to prove pretext. Third, Massey-Diez points out that UICMS employees were not adequately trained on what rights the FMLA provides employees. But this alone is not a basis for discrediting UICMS's proffered justification.

We agree with the district court that Massey-Diez has not created a dispute as to pretext. The uncontroverted evidence shows that Massey-Diez and her supervisors understood the March 21, 2013, meeting established a 90-day period during which Massey-Diez was expected to complete all charting within 48 hours, and that she failed to meet this requirement throughout that period. It also shows, without dispute, that at the time she took FMLA leave she was not in compliance with that requirement and that Massey-Diez understood her contract renewal to be in jeopardy if she did not comply. We are not persuaded that the timing of UICMS's decision and Massey-Diez's taking leave creates a dispute about pretext. "Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." Smith, 302 F.3d at 834. Dr. Powers's and Hansen's concerns about Massey-Diez's charting and Dr. Powers's concern about his license were communicated to Protextor and Hayden in June and November 2012, months before she took her leave. Further, e-mails among the UICMS supervisors referring to Massey-Diez's late charting occurred June 25 to 28, in the days following June 19, when the 90-day probationary period expired, mitigating any implication from the timing of the decision and her leave.

It is true that Hansen's June 27 text message to Massey-Diez appears to reference the Completion of Documentation Policy standard and that her June 28 e-mail to Protextor, Hayden, and Dr. Powers appears to have counted time that ran after Massey-Diez took leave, but this does not provide any basis for contesting Massey-Diez's noncompliance during the 90-day period, which she does not dispute. Neither does the mere mention of that standard by someone not involved in the decision, and made outside of the meeting where the decision was made, without more, amount to

-20-

a shift in UICMS's explanation. Hayden's uncorroborated testimony that there was concern at the meeting about her having taken time off does not lessen the credibility of UICMS's concern with prompt charting. Although Dr. Powers told Massey-Diez that she should have completed her charting while on leave, no evidence imputes his misunderstanding of the FMLA's protections to the decision made at the June 2 meeting or contradicts the assertion by all involved at that meeting that his concerns were sparked by a general problem with late charting rather than tardiness specifically occurring while Massey-Diez was on leave.

We also agree with the district court that the comparator offered by Massey-Diez was not situated similarly enough to her to show pretext through differential treatment. Massey-Diez offered evidence of another UICMS employee from another clinic who was also behind in charting and who was not disciplined as severely.

> At the pretext stage, "the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." [The plaintiff] must show that she and the employees outside of her protected group were "similarly situated in all relevant respects." "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."

Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 956 (8th Cir. 2012) (alterations in original) (first two quotations quoting Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 853 (8th Cir. 2005); next quoting Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000)). The comparator offered by Massey-Diez worked under a different supervising physician and in a clinic located in a rural as opposed to urban setting. The conditions, such as scheduling pressures and the ability to recruit new employees, attending an urban versus a rural clinic and Dr. Powers's subjective sensitivity to the threat tardy charting posed to his medical license are relevant aspects of Massey-

Diez's circumstances that distinguish her from her comparator.[10] Therefore we conclude that disparate treatment of Massey-Diez and her proposed comparator does not present a factual dispute as to pretext.

Finally, were Massey-Diez to demonstrate a prima facie case of discrimination, we do not believe it would be of such strength as to compel a finding that any proffered justification must be pretextual. Neither does the evidence create a dispute as to whether it was more likely that nonrenewal of Massey-Diez's contract was motivated by a prohibited reason than UICMS's proffered justification. There does not appear to be any evidence that a discriminatory intent underlaid UICMS's decision at the July 2 meeting. The reasons for Dr. Powers's concerns communicated at that meeting–tardy charting in general, not tied to a particular standard, and the accuracy of her notes–do not evidence a discriminatory intent.

For these reasons, we conclude that Massey-Diez has not presented circumstantial evidence of discriminatory intent by UICMS. Therefore, we agree with the district court that UICMS was entitled to judgment as a matter of law on Massey-Diez's discrimination claim as well.

---

[10]The comparator's clinic is located in Sigourney, Iowa, which has a population of about 2,000 and is not particularly close to a larger city. North Liberty, by contrast, has a population of about 15,000 and is just outside Iowa City, which has a population of about 70,000. Hayden testified as to the comparator's clinic: "[F]or one thing, I believe it's Sigourney, Iowa, not–and so it's more difficult to recruit." He also testified "that Dr. Powers has a different tolerance for [not complying with policies] than" the comparator's supervising physician.

## III. CONCLUSION

For the reasons stated herein, we affirm the district court's grant of UICMS's motion for summary judgment.

_____