STATE OF IOWA, Appellee, v. W. J. CLARK, Appellant.

Criminal law: TRIAL: OPENING STATEMENT: CHARACTER OF DEFEND-
1 ANT: EVIDENCE. It is the duty of a prosecuting attorney to con-
fine his opening statement to the jury to those matters of evidence
which the state is entitled to prove in establishing the crime
charged. To lead the jury to believe that the crime charged will
be established by proof of other crimes committed is prejudicial;
as the criminal record of defendant cannot be shown on the state's
case in chief, but is a matter which may be developed to discredit
his testimony.

Same: LARCENY: EVIDENCE. Any evidence tending to connect defend-
2 ant with the crime of larceny is admissible; as, where it appeared
that he was at the town where the crime was committed shortly
previous thereto, it was competent to show that when arrested he
stated to the officer that he had never been at the place; it was
also competent to show that shortly after the larceny defendant
was selling goods similar to those stolen under an assumed name.

Same. Where goods claimed to have been stolen were afterward found
3 in defendant's room, it was competent to show that a valise con-
taining wearing apparel and a revolver were also found there, al-
though there was no claim that these things had been stolen;
but the further evidence emphasizing the character and size of
the revolver and how it was loaded was improper.

Same: EVIDENCE OF OTHER CRIMES. It is the general rule that other
4 crimes committed by the defendant cannot be shown for the pur-
pose of establishing the crime charged; and in this case evidence
that defendant was a common thief and burglar, had been con-
victed of such crimes, and of taking indecent liberties with chil-
dren, that his name was found on the criminal records and that
he had escaped from prison, was not admissible for the purpose
of identification, or under any exception to the general rule.

Same: RECENT POSSESSION: INSTRUCTION. Where defendant accused of
5 larceny claimed to have procured the property from another, an in-
struction that if he had so explained his possession as to raise a
reasonable doubt whether the goods were *not* obtained by him as
claimed, then the possession would not weigh against him, thereby

stating the exact reverse of defendant's claim, was misleading and erroneous.

**Same:** REASONABLE DOUBT: INSTRUCTION. Although defendant's explanation of his recent possession of stolen property is not satisfactory to the jury, yet if it fairly raises a reasonable doubt whether he had any connection with the larceny, he is entitled to the benefit of the doubt and to an acquittal, and the jury should be so instructed.

*Appeal from Bremer District Court.*—HON. C. H. KELLEY, Judge.

WEDNESDAY, APRIL 9, 1913.

THE defendant was indicted, charged with the crime of larceny from a building. The indictment charges the taking of seventy-four mink pelts or skins, and alleges the value of the property taken to have been $303. Defendant was tried and convicted of the crime of larceny; the jury finding the value of the property taken to have been $88. He was sentenced to serve an indeterminate term in the penitentiary, not exceeding five years, and he appeals.—*Reversed* and *Remanded.*

*Sager & Sweet* for appellant.

*George Cosson,* Attorney-General, and *John Fletcher,* Assistant Attorney-General, for the State.

PRESTON, J.—I. Appellant complains of the conduct of the county attorney in his opening statement to the jury, and of the admission of evidence in regard to the matters thus referred to; he also complains of one of the instructions. The first two propositions may be considered together.

The record shows that, over defendant's objection, the counsel for the state in the opening statement to the jury said:

Now the evidence will further show, gentlemen of the jury, that this defendant, Clark, is a common thief and burglar. The evidence will show that he has been convicted of theft and burglary, and that he was sentenced to the House of Correction in Chicago, and that he escaped therefrom. The evidence will show, gentlemen of the jury, when this defendant was arrested on the premises of the Bach Fur Company of Chicago, that he told the officers that he had never been arrested, and that he did not give them his right name. The evidence will show that the Officers Mayer and Abbey, who will appear before you, when they took him to what is known as the Bureau of Identification in Chicago—

At this point objection was made, and the court admonished the prosecutor as follows:

Court: Well, of course, the scope of an opening statement is clear to counsel, and he will, of course, keep within it in a case of this character.

The prosecutor continued:

The evidence will show, gentlemen of the jury, that when this gentleman, Mr. Clark, was taken to this Bureau of Identification, where they keep a record of crooks and criminals that have been brought into court, and when this record was read they found the burglaries that he had committed and found that he had been arrested under the name of William Clark, W. J. Clark, and under an assumed name, and they found that he had been sentenced and escaped from the House of Correction; that he had been convicted of a felony, of burglary, and he made no denial of that fact. He did not say—

Mr. Sweet: Wait just a moment; we object to this as irrelevant, immaterial, incompetent, and beyond the scope of a proper opening statement to the jury of the facts in the case and improper, and we ask for the court's ruling upon the same.

By the Court: Well, if counsel expects to show the matters to which he refers by evidence, it might be receivable.

Counsel: That is what we expect to do, your honor.

By the Court: Very well. (Defendant excepts to the ruling of the court.)

The larceny is alleged to have taken place at Tripoli, Iowa, about December 23, 1910, and on the 29th of December the defendant was arrested by the police in Chicago.

Wm. H. Mayer testified on behalf of the state:

Am forty-eight years of age. Reside at 620 Charlotte street, Chicago, Ill. Have resided in Chicago forty-eight years. I have been a police officer of the city of Chicago a little over twenty years. I have seen the defendant before. I first saw the defendant in Chicago on December 29, 1910, at the Bach Fur Company Store, 108-110 West Michigan street. He was clean shaven at the time. About 12 o'clock noon on December 29th we had a telephone call come to the station that there was a man down to the Bach fur house selling furs. Officer Abbey and I were sent down. We found Mr. Clark there. He was in the possession of a Pinkerton man. We took him to the Chicago Avenue Station. He said he had never been arrested before. We took him to the Bureau of Identification the next day. We took Mr. Clark up there and when he got upstairs the man asked him, 'Mr. Clark, were you ever here before?' He says, 'Yes.' He says, 'How long ago?' He told him. He said. 'Did you have your picture taken?' and he says, 'Yes,' and he went right to the show case and picked out the picture there, and he says, 'Is this yours?' Clark says, 'Yes.' Q. What did he say when they asked him if he had ever been convicted of a felony?

Mr. Sweet: Just a moment now. We object to this as irrelevant, immaterial, incompetent, and the statute provides a method by which this question can be asked the defendant, and it is irrelevant, immaterial, and incompetent under the issues in this case.

By the Court: Well, it is proper to show what transpired —what was done and what was said by the defendant or others in his presence. (Defendant excepts to the ruling of the court.)

Q. Now what did the Bureau do, what did the man in charge of the bureau do or say in the presence of Clark? A. Why, he got the picture out, handed that to Clark, and says, 'Clark, is that your picture?' and Clark says, 'Yes.' Q. Was there anything said—was there anything said there about what this defendant Clark had been accused of in your presence? A. Yes, sir. Q. Now state what was said. A. Why

the man said that he was accused, the record showed that he was accused of committing burglary in a freight car and was found with a dark lantern and loaded revolver in his possession at the time he was arrested. Q. What did he say? A. He said somebody saw him down there in the railroad yard, and that they jobbed him. Q. And was there anything else said about any other case? A. Now the man at the Bureau read off the list such as it is on there, these records. Q. Was there anything said about his being sent to Joliet, Ill.?

Mr. Sweet: Just a moment; we make the same objection as last made. These questions are leading, and it is an improper manner for counsel to inject into the record this class of evidence.

Court: State what was said. (Defendant excepts.)

A. The gentleman read off the record, and stated that he had been sent up for a burglary charge and also for indecent liberties with children, and two charges of burglary. Q. And what did the defendant say? A. He didn't say anything to the other charges, only the other charge when he was sentenced from the freight car, and then he said they jobbed him. Q. He made no other reply when the other charges were read to him? A. No, sir.

James Abbey, a witness for the state, testified:

I have been a police officer of Chicago for twenty-three years. I saw defendant first at 108 Michigan street, December 29th, between 12 and 1 o'clock, at the Bach fur house. There was a telephone message came to the station for us to send some men down to the fur house. They had a man down there that was trying to dispose of some furs. They sent down Officer Mayer and myself, and we got this Mr. Clark, and brought him to the station. We kept him in the Chicago Avenue Police Station three or four days. I don't know what was said to Clark. The Bach Fur Company men were talking to Officer Mayer, and I was watching this man, and he was talking to the clerks. We took him to his room on Congress street. We found two valises and a revolver. Q. What kind of a revolver was it?

Mr. Sweet: Just a moment; we object to that as irrelevant, immaterial, incompetent, no claim made here that any revolver was taken.

Counsel for State: It is simply to show your honor, what was found there.

By the Court: Well, go ahead.

Mr. Sweet: Your honor, they are asking for a description of this matter, and there is no claim made here that any revolver was taken.

By the Court: Well, I suppose it is not on that theory.

State's Counsel: No; that is not the theory; it is only as to what was found there.

By the Court: Well, go ahead. (Defendant excepts to the ruling of the court.)

Q. What was the size of the revolver, what caliber? A. It was a 38. Q. Was it loaded? A. Yes, sir. Q. How many chambers? A. Five.

Mr. Sweet: We make the same objection.

Q. And where was that found in his room? A. In the bureau drawer. Q. And what else did you find in his room? A. Some valises; two valises. We found ten or eleven mink pelts in his room. We brought them to the Chicago Avenue Police Station.

All of the foregoing evidence was introduced by the state in making its case in chief, and before the defendant had testified as a witness. There is evidence in the record tending to show that defendant was seen in the town of Tripoli, Iowa, December 20th or 21st, and that in Chicago he denied having ever been there; that in selling mink skins to different parties in Chicago defendant sold some of them under the name of Norman, and others under another name; that there was a person by the name of Norman living in the town of Tripoli. The defendant testified that he obtained the furs he sold in Chicago from one Kramer at Dubuque, and that Kramer asked defendant to take them to Chicago to sell them, and that Kramer instructed him to give the name of Norman. The pelts were alleged to have been stolen from the premises of one Panzer, who claimed to be able to identify the furs sold by defendant in Chicago, or some of them, although other parties also claimed some of the same pelts. The defendant testified that he left Tripoli at a time prior to the alleged

larceny, and relied upon an alibi. We shall not set out or refer to the evidence further, except to say that it was a question for the jury as to whether or not defendant is guilty.

This is not a case where it is claimed there was misconduct of the prosecutor in the closing argument, and where, as is often the case, the prosecutor has been goaded by counsel for defense into saying something he should not have said. So far· as anything appears in this record, counsel for defense were·not over-zealous, and appear to have been fair and courteous. It is apparent that counsel for the state started out on the trial of this case on the theory that defendant should be convicted of the crime charged, because he had been convicted of other crimes. The matter was emphasized in the opening statement, and followed up by evidence on the same subject. Evidently the purpose was to prejudice the jury against the defendant, and break him down and discredit him and his case at the start. The question is, and was, whether defendant is guilty of the crime charged, and on that question he is entitled to a fair trial. If his life has been such as to discredit his testimony, he must suffer the consequences, but this is a matter which should be shown in a proper and legal way. As a witness he may be asked on cross-examination as to prior convictions of felony, and, if denied, the law provides a method of proving it, if the fact exists. As to opening statements, it is a familiar rule that counsel are not held to the utmost strictness; they may have been misin-. formed or deceived by their witnesses, and are not expected to be able to foresee, in all cases, what the ruling of the court will be when the evidence is offered; the court is not familiar with the case at the commencement of the trial, and may not know the bearing of the evidence until the case develops. If it is doubtful whether evidence referred to in the opening statement is admissible, the better rule is to withhold the statement or so much as is doubtful until the court can determine. But

1. CRIMINAL LAW : trial : opening statement : character of defendant : evidence.

good faith is required. In this case it is clear that many of the matters were improper and prejudicial.

Defendant was selling mink pelts in Chicago a few days after the alleged larceny of pelts in Tripoli, Iowa. There was evidence tending to show that defendant was in Tripoli about the time or soon before the alleged larceny. Under these circumstances, it was competent to show that he stated to the officers that he had never been in Tripoli, also that in selling furs he gave assumed names, and any other statement by him, if any, or in his presence, tending to connect him with the crime charged, or tending to show his guilt of that crime.

2. SAME: larceny: evidence.

No pelts were found on defendant's person when arrested, but it is claimed that pelts were found in his room when he was taken there. No question is made on this appeal as to its being his room, so that we assume they were found in his possession. When mink pelts were found in his room, and which were claimed to have been those taken at the time of the commission of the crime charged, there was no impropriety, under the circumstances of this case, in permitting evidence that in his room was another valise containing wearing apparel, and that a revolver was found in the room, even though there was no claim that such clothing and revolver had been stolen. The finding of the valise and clothing, if his, or in his room and possession, might have a tendency to show that he had been away and recently returned. Men who steal at night frequently carry a revolver. But the evidence in reference to the revolver was unduly emphasized by showing in detail its size, that it was loaded, etc. This was unnecessary; and, when considered in connection with the other improper matters, the purpose is obvious. The finding of the revolver was at the time of the discovery of the skins alleged to have been stolen, and was a part of that transaction. The possession of the skins was a circumstance against the defendant.

3. SAME.

The facts are unlike those in *State v. Berger*, 121 Iowa,

586, where witnesses testified to having seen defendant with a revolver at a time prior to the commission of the crime charged, and in no manner connected therewith.  Nor is this case like *State v. Brundige,* 118 Iowa, 92, where tobacco had been stolen, which was found in defendant's house, with candy and other articles, from which the inference was sought to be drawn that defendant had also stolen such other articles at another time not connected with the larceny of the tobacco. The rule is that evidence of other crimes committed by defendant is not admissible.  *State v. Vance,* 119 Iowa, 685; *State v. Crofford,* 121 Iowa, 395, and cases therein cited.

To this rule there are exceptions, and these exceptions are stated in *State v. Vance, supra.*  It is contended on behalf of the state that the matters referred to by the prosecutor, and the evidence in regard to defendant, stated by him or in his presence, come within some of the exceptions, in that such matters tend to identify the defendant as the person who committed the crime charged, and that it was proper, even though incidentally the commission of other crimes was shown.  To this we cannot agree.  Defendant was indicted as W. J. Clark, and gave that name when arrested, and there is no claim here that such is not his true name.  To show that he had been convicted of other crimes under the name of W. J. Clark would simply identify W. J. Clark as W. J. Clark.  If his real name was Clark, and he had been known as such, but on being arrested he had given another name, it would no doubt be proper to show his real name and identify him as such; but even then it would not be competent to go to the extent the prosecutor did here.  We are abundantly satisfied that it was not the purpose of the prosecution to identify the defendant.  The prosecutor stated that the defendant was a "common thief," a burglar; that he had been "convicted of theft"; that he had been "convicted of burglary"; that he had been "sentenced to the House of Correction in Chicago"; that he "escaped therefrom"; that defendant's name was

4. SAME: evidence of other crimes.

found in a "record of crooks and criminals"; that he had "committed burglaries"; that when taken to the Bureau of Indentification "that he was accused of committing burglary"; "that he was found with a loaded revolver in his possession"; "that he had been arrested." The record was not produced, but the man at the Bureau read off the list, and a witness was permitted to testify that this alleged record, read in the presence of defendant, shows that defendant "had been sent up for a burglary charge, that he had been sent up for indecent liberties with children, and two charges of burglary." How these matters could identify the defendant or connect him in any way with the alleged crime for which he was being tried we are unable to comprehend, nor can it be justly claimed that they come within any of the exceptions to the rule. In *State v. Berger* this court ruled that it was error to permit proof of conversations with accused tending to show his general criminal character or the commission of other offenses by him, and that such matters should be carefully avoided, save in the few exceptional cases where such evidence is clearly admissible.

II.   Instruction No. 9 is complained of. This instruction attempted to state the law in regard to recent possession of stolen property. The complaint is in regard to the last sentence, which reads: "But if the defendant has so explained such possession as to raise in your minds a reasonable doubt as to whether such mink pelts or skins were *not* obtained by him from Mr. Kramer, as defendant claims, then the fact of such possession would not weigh against the defendant." We have italicized the word "not." We do not think the court intended this instruction in this way. The proposition is the exact reverse of defendant's claim. Defendant claimed and testified he *did* get the pelts from Kramer. Counsel state in argument that the court made some changes in this instruction with a pen, and by oversight did not cross out the word

5. SAME: recent possession: instruction.

"not." However that may be, the instruction as given was incorrect, and would have a tendency to mislead the jury.

It is further objected that the instruction excludes the idea that, if defendant's explanation raised a reasonable doubt on the whole case as to his guilt, he was entitled to an acquittal, without reference to the source of his possession. Defendant made no other claim or explanation of his possession of the furs except that he obtained them of Kramer. The court doubtless intended to say that, if defendant did get them in that way, then the fact of his possession should not weigh against him. On the question of recent possession of stolen property, we said in *State v. Kimes*, 145 Iowa, 346 : "    .   .   . If after giving proper consideration to all the inculpatory circumstances adduced in support of the prosecution there remains in the minds of the jurors a reasonable doubt of the guilt of the accused, he is entitled to an acquittal, even though they are not satisfied with the truth or the sufficiency of his explanation." And in *State v. Bartlett*, 128 Iowa, 518, it was said : "His explanation may not be satisfactory, yet, if it be such as to fairly raise in the minds of the jury a reasonable doubt whether he had any guilty connection with the larceny, then he is entitled to the benefit of that doubt, and the possession of the stolen property will not in itself justify his conviction." The court should have so worded his instruction as to embody this thought therein. The discussion in this opinion is not intended for the jury. On the retrial the court should not permit counsel on either side to refer to it in the presence of the jury.

For the errors pointed out, the case is *Reversed* and *Remanded.*

6. SAME: reasonable doubt: instruction.