**IN THE COURT OF APPEALS OF IOWA**

No. 17-0053
Filed July 18, 2018

**WALTER REED,**
     Plaintiff-Appellant,

**vs.**

**STATE OF IOWA and STATE OF IOWA DEPARTMENT OF TRANSPORTATION,**
     Defendants-Appellees.
_____

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

Walter Reed appeals a jury verdict in favor of the State and the Iowa Department of Transportation on his claims of race discrimination and retaliatory discharge. **REVERSED AND REMANDED.**

 Lori A. Bullock, Thomas A. Newkirk, and Beatriz A. Mate-Kodjo of Newkirk Zwagerman, P.L.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Julia S. Kim and B.J. Terrones, Assistant Attorneys General, for appellees.

Heard by Vaitheswaran, P.J., and Potterfield and Tabor, JJ.

**VAITHESWARAN, Presiding Judge.**

Walter Reed appeals a jury verdict in favor of the State and the Iowa Department of Transportation (DOT) on his claims of race discrimination and retaliatory discharge from employment.[1] He contends the district court (1) erred in granting summary judgment on two grounds for retaliation and (2) abused its discretion in "limiting [his] trial arguments and evidence to only those arguments and evidence [he] asserted in resistance to summary judgment."

## I.      *Background Facts and Proceedings*

A federal statute known as Title VI states, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *See* 42 U.S.C. § 2000d (2015). A federal report cited the Department of Transportation for major deficiencies in compliance with the statute and recommended the establishment of a civil rights unit within the department to address the deficiencies.

Two years after the report was issued, the department hired Reed to the position of civil rights coordinator. His primary responsibilities were to staff the civil rights unit and steer the department towards Title VI compliance by performing "sub-recipient reviews." According to Reed, a sub-recipient "is a city, county, or regional planning organization and they would receive funds from the Iowa DOT to do construction projects within their community. . . . If they use federal funds for that, they would have a responsibility to not discriminate in the way they contracted out

---

[1] We will generally refer to both defendants as "the State," except as otherwise noted.

the local contractors." Reed's office was to "send a letter and provide in that letter the tool that would be used to gather the documents from them and a report from them on the way they distribute those funds and what notifications or proof they had that they didn't discriminate in the way they did that."

Reed is African-American. Reed's supervisor was Todd Sadler. Sadler is white. For approximately two years, Reed worked in the position without incident, garnering positive performance evaluations. In the spring of 2012, a vacancy arose for an external civil rights administrator. Sadler transferred Jacqueline Miskimins to the position. Reed expressed surprise at the transfer and discomfort at the way the hire was announced.

Meanwhile, Miskimins referred to a black employee as "snarky." That employee filed an "ongoing workplace environment complaint" against Miskimins, which was investigated by Sadler. Sadler learned that team meetings headed by Reed were "spirited." He asked Reed to complete an internal communication plan.

The plan Reed presented did not satisfy Sadler. Toward the end of 2012, Sadler suspended Reed with pay. Within a week of the suspension, Reed filed a complaint with the Iowa Civil Rights Commission. He alleged retaliation and discrimination on the basis of race. In Reed's view, Sadler was upset with him because he questioned the removal of a "five years civil rights experience" qualification requirement in the job posting for the position Miskimins acquired. Reed also asserted the investigation resulting in his suspension was a pretext for the black employee's allegations against Miskimins.

Two months after Reed filed his civil rights complaint, Sadler fired Reed. He reasoned Reed:

-Did not ensure the accuracy of sub-recipient and contractor compliance review data reported to [a federal agency].
-Did not provide [the federal agency] information and access to data and files when requested.
-Did not complete external complaints or request extensions.
-Refused to update the plan related to addressing and correcting work environment issues within the Civil Rights team.
-Failed to comply with DOT PPM 030.02 Computer Workstations and 030.09 Internet and Intranet Services when you used DOT resources to send non work related emails during work time.

Reed sued the State for race discrimination and retaliation under the Iowa Civil Rights Act (ICRA). *See* Iowa Code §§ 216.6, 216.11 (2015). The State filed a motion for summary judgment.

The district court found a genuine issue of material fact with respect to the race discrimination claim. The court next identified four separate retaliation "claims." The court found the record "minimally sufficient to create a fact issue as to whether Reed was engaged in opposing discrimination when he suggested changes in DOT's approach to minority contractor recruitment or enforcement of Title VI requirements regarding minority contractors" and whether there was a "connection between Reed's termination and his questions and suggestions regarding DOT's approach to minority contractor recruitment or enforcement of Title VI requirements regarding minority contractors." The court granted the State summary judgment on two additional "claims": (1) "Reed's retaliation claim to the extent it is based on his seeking a promotion" and (2) "his questioning the removal of the five year experience requirement when Miskimins was hired." The fourth "claim," according to the court, was Reed's assertion that he was fired in retaliation for filing a civil rights complaint. The court found this "claim" was not pled and was never properly asserted. Accordingly, the court declined to address it.

The State filed motions in limine seeking in part to exclude (1) "any evidence or testimony of complaints or investigations involving other acts and other acts after [the date of termination]," (2) "any evidence or testimony that plaintiff was treated differently than . . . other employees," (3) "any evidence or testimony regarding the civil rights unit after plaintiff's discharge," evidence of complaints or investigations of other DOT employees, evidence comparing his treatment to that of other DOT employees, and changes in the civil rights unit after his termination, and (4) "topics irrelevant to the claims in this case, such as but not limited to, transfer of Miskimins, hiring process for the external civil rights administrator position, other employees' qualifications for the external civil rights administrator position, perceptions of job duties after the transfer, observations of the meeting, and observations of a consultant." The district court conditionally granted the motions, subject to a showing of relevance at trial.

During trial, the court excluded most of the evidence outlined above. As noted, the jury found for the State. This appeal followed.

## II.     *Summary Judgment Ruling*

Summary judgment is appropriate when the moving party establishes "there is no genuine issue as to any material fact" and the party "is entitled to judgment as a matter of law." Iowa R. Civ. P. 1.981(3). "[W]e view the record in the light most favorable to the nonmoving party and allow that party all reasonable inferences that can be drawn from the record." *Wernimont v. Wernimont*, 686 N.W.2d 186, 189 (Iowa 2004).

6

### *A. Retaliatory Discharge–Filing of Civil Rights Complaint*

Reed's original petition alleged the department and its directors retaliated against him "for seeking reclassification, inquiring into the DOT's compliance with minority contractor recruitment, and complaining about the DOT's hiring practices" by (1) "[f]ighting his reclassification appeal after telling him they planned to reclassify him," (2) "threatening to 'investigate' him after [he] questioned the unfair hiring of an under-qualified white employee over three qualified minority employees," (3) "placing him on suspension without giving him proper notice of suspension with the grounds for suspension," and (4) firing him. Reed subsequently filed two amended petitions, also containing this paragraph.

The State moved for summary judgment. With respect to the retaliation claim, the State asserted,

> Plaintiff cannot maintain any retaliation claim because he did not engage in any protected activity under the ICRA, did not suffer any adverse employment action other than his termination and cannot establish a causal connection between any alleged "protected activity" and his termination. Moreover, DOT can establish legitimate, non-retaliatory reasons for the termination. Plaintiff cannot establish that these reasons are pretext.

The district court disposed of Reed's assertions concerning his filing of the civil rights complaint as follows:

> For the first time, in his memorandum in resistance to the State's summary judgment motion, Reed asserts that he was fired in retaliation for his filing a civil rights complaint. The State objects that this is unfair, that it was entitled to know the incident upon which Reed's retaliation claim is based and that Reed cannot assert a new claim for the first time in a brief responding to a summary judgment motion. The court agrees. Reed's finally amended petition, filed long after he filed his civil rights complaint, specifies the activities he engaged in which he claims were the basis of the State's retaliation. Filing a civil rights complaint is not one of them. There is no indication Reed ever identified this claim in discovery either. Finally, Reed has

never sought to amend his petition to specify a claim of retaliation based on his filing a civil rights complaint. The court concludes that Reed has never asserted this claim and, therefore, addresses only the retaliation claims which he has properly asserted.

On appeal, Reed asserts, "[T]he district court improperly granted summary judgment for the DOT on the issue of whether Reed's civil rights complaint could be used to support his claim of retaliation."

The ICRA makes it "an unfair or discriminatory practice for":

Any person to discriminate or retaliate against another person in any of the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter.

Iowa Code § 216.11(2).

To establish a prima facie case of retaliation under the ICRA, a plaintiff must show (1) he or she was engaged in statutorily protected activity, (2) the employer took adverse employment action against him or her, and (3) there was a causal connection between his or her participation in the protected activity and the adverse employment action taken.

*Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 750 (Iowa 2006).[2] Courts apply the *McDonnell Douglas* three-part burden-shifting analysis to retaliation claims. *See McDonnell Douglas v. Green*, 411 U.S. 792, 802-803 (1973); *see also Steck v. Francis*, 365 F. Supp. 2d 951, 976 (N.D. Iowa 2005) (reiterating holding in *Desert Palace v. Costa*, 539 U.S. 90 (2003) did not change the analysis for retaliation claims)).

---

[2] The Iowa Supreme Court recently spoke to the causation standard in retaliatory discharge cases. *See Haskenhoff v. Homeland Energy Sols., L.L.C.*, 897 N.W.2d 553, 582-85 (Iowa 2017). The court overturned a jury instruction applying the motivating-factor causation standard. *Id.* at 586. We recently summarized the differences of opinion in *Haskenhoff*. *See Johnson v. Mental Health Inst.*, No. 16-1447, 2018 WL 351601, at *7-8 (Iowa Ct. App. Jan. 10, 2018). The jury instructions in Reed's case adopted the "motivating factor" standard of causation for both the discrimination and retaliation claims.

Although Reed pled a retaliatory discharge claim, he did not cite the civil rights complaint or allege his termination was in retaliation for the filing of the complaint. The State seizes on this omission, arguing Reed "could not be permitted to add the filing of his [civil rights] complaint as a protected activity for the first time in resisting summary judgment." Reed counters that he had no obligation to plead retaliatory discharge based on the filing of the civil rights complaint, particularly where the State was on notice of the complaint and responded to it before his termination. Reed has the better argument.

"Iowa is a notice-pleading state." *Weyerhaeuser Co. v. Thermogas Co.*, 620 N.W.2d 819, 831 (Iowa 2000). "A petition need not plead ultimate facts to raise or preserve a claim." *Id.* There is also no obligation to plead "specific legal theories for recovery." *Cemen Tech, Inc. v. Three D Indus., L.L.C.*, 753 N.W.2d 1, 12 (Iowa 2008). "The petition is sufficient if it 'apprises the opposing party of the incident from which the claim arose and the general nature of the action.'" *Weyerhaeuser*, 620 N.W.2d at 831 (citation omitted); *cf. Colbert v. State, Dep't of Human Servs.*, No. 13-0633, 2014 WL 5861777, at *3 (Iowa Ct. App. Nov. 13, 2014) (disagreeing with plaintiff's assertion that "the petition put the State on notice that any individual incident during the course of her employment could be the basis of a retaliation claim" where the petition only put the State on notice of two different claims—"a discrete act and a pattern establishing a hostile work environment"). While notice pleading does not dispense with the need for specificity, "[i]t enables a party to postpone the necessity of specificity from the pleading to the pretrial stage." *Kestar v. Bruns*, 326 N.W.2d 279, 284 (Iowa 1982). This is precisely what happened here.

As a preliminary matter, it is worth noting that the State, rather than Reed, raised his filing of the civil rights complaint. In its statement of undisputed facts supporting its summary judgment motion, the State included the following paragraphs:

> 58. Following the interview, the DOT on December 7, 2012, placed Mr. Reed on paid administrative leave pending completion of an investigation into possible violations of DOT work rules and policies.
> 59. On December 13, 2012, Mr. Reed filed a complaint with the Iowa Civil Rights Commission.
> . . . .
> 78. Mr. Reed was given written notice of termination on February 14, 2013, effective immediately.

The State filed an appendix in support of the motion and included within it the entirety of Reed's civil rights complaint. By the State's own admission, then, Reed's filing of the complaint before his termination was a material, undisputed fact.

Not surprisingly, Reed agreed. In his response to the summary judgment motion, he "admit[ted]" he "engaged in protected activity on December 13, 2012 by filing a civil rights complaint." *See Schoonover v. Schneider Nat'l Carriers, Inc.*, 492 F. Supp. 2d 1103, 1152 (S.D. Iowa 2007) ("Engagement in a statutorily protected activity occurs where the plaintiff files a formal complaint protesting the allegedly unlawful activity . . . ."). He further stated that his supervisor "received a copy of Plaintiff's civil rights complaint and took time to review it." *See id.* at 1157 (stating knowledge of decision maker of protected activity, together with timing of filing, may establish causation). He argued it was "a genuinely disputed material fact as to whether [he] was retaliated against."

Reed's brief in resistance to the summary judgment motion went even further. He asserted, "The filing of a civil rights complaint on the basis of race is protected

activity under the Iowa Civil Rights Act." He also noted he was fired "just two months after filing his civil rights complaint" and stated, "In addition to the many facts and contradictory statements that could lead a reasonable juror to believe that retaliation motivated [his] termination, suspicious timing adds further support for such reasonable inferences." *See Boyle*, 710 N.W.2d at 750 (reversing district court's refusal to rule on a retaliatory discharge claim after stating, "While mere coincidence of timing does not conclusively establish this element, the timing of the action, combined with all the other circumstances present in this case, entitles her to a ruling on her retaliatory discharge claim"); *see also Reed v. Cedar Cty.*, 474 F. Supp. 2d. 1045, 1070-71 (N.D. Iowa 2007) (concluding plaintiff established a causal connection between the adverse employment action and her harassment complaint and, where the defendant did not provide a legitimate nondiscriminatory reason for the adverse employment action, the retaliation claim would be submitted to the jury). Reed further asserted that a pretextual firing could be inferred from Sadler's decision to investigate him after he filed the civil rights complaint instead of recusing himself, as department policy required. *See Wilson v. City of Des Moines*, 338 F. Supp. 2d 1008, 1027 (S.D. Iowa 2004) ("A plaintiff may also establish pretext by showing it was not the employer's policy or practice to respond to such problems in the manner it responded in plaintiff's case."); *see also Howell v. Merritt Co.*, 585 N.W.2d 278, 281 (Iowa 1998) (reversing summary judgment ruling after concluding plaintiff rebutted defendant's nondiscriminatory reason for the termination).

In sum, Reed used the State's undisputed fact of his filing of the civil rights complaint to generate a fact issue on the State's contention that he (1) did not engage in protected activity, (2) did not establish a causal connection between the

protected activity and his termination, and (3) did not establish that the asserted reasons for his termination were pretextual. *See Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 245 (Iowa 2006) ("When a motion for summary judgment is properly supported, the nonmoving party is required to respond with specific facts that show a genuine issue for trial."). The question of whether he was terminated in retaliation for filing the civil rights complaint was one for the jury. *See Howell*, 585 N.W.2d at 281. We reverse and remand for trial.

### B. Challenge to the Transfer of Miskimins

In his petition, Reed alleged the position of external civil rights administrator (1) "required five years of civil rights experience and a specified state job classification," (2) "Miskimins, a white woman, was a DOT employee that applied for the position" but did not "have the requisite civil rights experience," (3) "[t]here were three civil rights employees that were interested and qualified to do the job," (4) Sadler reposted the job without the experience requirement, and (5) Miskimins was "hired for the . . . position on June 22, 2012." Reed alleged he complained that the job posting should not have been changed to accommodate Miskimins. He claimed he was fired in retaliation for questioning her hiring.

The district court granted summary judgment on this ground for retaliation. The court reasoned, "[T]here is no evidentiary support for the contention that Reed was engaged in opposing discrimination that is outlawed under chapter 216 when he . . . stated that the 'method of announcement' of Miskimins' hiring was 'uncomfortable.'"

On appeal, Reed contends the district court erred "by granting summary judgment on [his] evidence of opposing discrimination by challenging the DOT

changing a job qualification requirement and subsequently hiring an unqualified white employee for an important position at the department." He asserts, "Had the district court properly viewed the evidence in the light most favorable to [him,] it would have found a question of material fact existed as to whether [he] engaged in protected activity when he opposed the hiring of Miskimins in lieu of more qualified racial minorities."

The State points out the three racial minorities Reed believed were more qualified did not meet the posted job classification requirement. Reed now concedes as much, but that is not the nub of the issue. Under section 216.11, the question is whether Reed "lawfully opposed any practice forbidden under this chapter" and whether Sadler fired him in retaliation for his opposition. On this question, the summary judgment record reveals the following facts.

The external civil rights administrator position for which Miskimins applied was an "Executive Officer 1" position. The Iowa Department of Administrative Services specification for an Executive Officer 1 contained several qualification alternatives, including "[g]raduation from an accredited four year college or university and the equivalent of three years of full-time professional level experience such as program administration, development, management or operations."[3] The

---

[3] The specification set forth alternative qualification regimens:

Graduation from an accredited four year college or university and the equivalent of three years of full-time professional level experience such as program administration, development, management or operations;
OR
substitution of experience of the caliber and scope indicated above for the required undergraduate college education on the basis that one year of qualifying experience is equivalent to one year of undergraduate education;
OR
graduation from the Iowa Certified Public Manager Program may substitute for one year of education or one year of experience;

specification allowed the appointing authority to request a "selective certification" requiring added experience in certain listed areas, including "civil rights/affirmative action." The hiring authority could ask for a "minimum of twelve semester hours of education, six months of experience, or a combination of both, or a specific certificate, license, or endorsement in . . . civil rights/affirmative action."

A collective bargaining agreement governed employee transfers into vacant positions. The agreement stated, "The Employer is not obligated to retrain employees in order to qualify them for transfers under the provision of this Article." The most senior employee who made a request for a transfer was to be transferred, provided the employee "possess[ed] the ability to perform the duties as assigned and m[et] any job related special or selective certification requirements." The employer also could deny the transfer "if the transfer would substantially impair the Employer's ability to maintain operational efficiency."

Consistent with the bargaining agreement, the contract transfer announcement stated, "IT IS NOT THE RESPONSIBILITY OF THE AGENCY TO RETRAIN EMPLOYEES TO PERFORM THE DUTIES OF THE POSITION." The original job posting also included the following language:

> Minimum Qualifications: Experience equal to five years of full-time work with members of legally protected classes in areas of civil rights, human relations, social/economic problem solving or equal employment opportunity/affirmative action experience directed at the

---

OR
substitution of twenty-four hours of graduate level course work in a special program curriculum such as Social Work, Law, Education, Engineering, or Public or Business Administration for each year of the required experience to a maximum substitution of two years;
OR
employees with current continuous experience in the state executive branch that have the equivalent of six years of full time qualifying experience and education shall be considered as qualified.

prevention and/or elimination of discrimination against members of legally protected classes.[4]

The posting contained a "Civil Rights selective," which, according to Sadler's deposition testimony, was requested after consultation with Reed.

A personnel assistant later informed Sadler that the "minimum qualifications" information in the posting did not appear in the Department of Administrative Services specification. Sadler responded that the job vacancy would have to be reposted because it did "not follow the DAS spec."

Shortly thereafter, Miskimins notified Sadler that when she first applied for the vacancy, she "was told [she] did not meet the requirements laid out in the announcement." She acknowledged she did not "have immediate experience [with] Title VI programs" but stated she had "extensive experience with developing, implementing, maintaining, and evaluating federal programs." She also conceded she lacked "on-the-job experience working in the civil rights related field" but stated she had "over 12 hours of masters level classes in" related topics.

The vacancy was reposted without the minimum qualifications language. The civil rights selective certification requirement was retained. Sadler informed Reed of the change in the job description. He responded that he believed the minimum qualifications language was copied from the job description of the previous "external civil rights employee."

---

[4] The State asserts "the five-year minimum qualification language that DOT included . . . was not appropriate" because "DAS's established minimum qualification for an [Executive Officer] 1 job classification is '[g]raduation from an accredited four year college or university and the equivalent of *three-years* of full time professional level experience.'" But, as noted, this was only one of the established minimum qualifications for the Executive Officer 1 position.

Meanwhile, Miskimins learned she was initially disqualified based on her failure to meet the six-month civil rights selective certification requirement. She filed an appeal, arguing her masters degrees in (1) adult learning and organizational performance with an emphasis in leadership development and human resources and (2) public administration "with some diversity classes" satisfied the selective. Her transfer was approved.

Miskimins was hired without Reed's input. As noted, Reed sent an email to Sadler expressing surprise at her hire, asking about her qualifications, and stating the way in which the hire was announced was uncomfortable.

The State asserts the email was the only expression of Reed's dissatisfaction in the summary judgment record. The State also asserts the collective bargaining agreement required the department "to let Miskimins contract transfer into the position." We disagree with both assertions.

In his pretrial deposition, Sadler stated he had an in-person meeting with Reed about the issue. He said, "[F]rom the get-go [Reed] didn't believe . . . that transfer was appropriate, and he didn't think she had any experience." According to Sadler, Reed expressed problems with Miskimins' hire "a couple of times." Sadler agreed Miskimins did not "hit the ground running" and could not have "taken an investigation on day one and completed it." In his words, "She would need training." As noted, the bargaining agreement required the transferee to possess the necessary job skills without retraining.

In addition to Sadler's deposition testimony, Reed testified by deposition that, after he questioned Sadler's removal of the minimum qualifications language, he and Sadler "started having a cooler relationship." Following "that questioning," he

stated they "had very few weekly meetings, very few."  In his words, "I felt that was intentional, and I felt like I was being treated different than I was at the beginning, and . . . that's why I believe ultimately my termination was a result of retaliation associated with that."

In short, the summary judgment record contained evidence of (1) why the "minimum qualifications" language was included in the original posting, (2) Sadler's knowledge of Reed's misgivings about the Miskimins transfer "from the get-go," (3) Reed's belief his relationship with Sadler cooled after he conveyed his misgivings about Miskimins' qualifications, (4) Sadler's acknowledgment that Miskimins was unable to perform the job without training, and (5) the collective bargaining provision requiring transferees to qualify for the job without retraining.  We conclude Reed generated a genuine issue of material fact on whether he was fired in retaliation for his complaints about Miskimins' transfer into the position.  We reverse the summary judgment ruling in favor of the State and remand for trial on this issue.

### III.    Limitation of Trial Evidence

Reed contends, "[T]he district court abused its discretion by limiting [his] trial arguments and evidence to only those . . . [he] asserted in resistance to summary judgment."  He argues the court should not have excluded (1) "contextual evidence regarding the Civil Rights Unit at the DOT before and after [his] termination," (2) evidence relating to similarly situated employees, (3) evidence of his challenge to the transfer of Miskimins, and (4) evidence of the investigation of a workplace environment complaint against Miskimins.

The State preliminarily responds with error preservation concerns, which we find unpersuasive.  *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002)

("[I]ssues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). The issues were raised and decided before, during, and after trial. Error was preserved and we proceed to the merits.

In considering the merits, the primary question is whether the excluded evidence was relevant. *See* Iowa R. Evid. 5.402 ("Relevant evidence is admissible. . . . Irrelevant evidence is not admissible"). Relevant evidence is evidence having "any tendency to make a fact more or less probable than it would be without the evidence" and "[t]he fact is of consequence in determining the action." Iowa R. Evid. 5.401. Our review is for an abuse of discretion. *See Shawhan v. Polk Cty.*, 420 N.W.2d 808, 809 (Iowa 1988). If the evidence is relevant, we must determine whether its exclusion prejudiced Reed. *See In re Estate of Woodroffe*, 742 N.W.2d 94, 108 (Iowa 2007). Reed's assertion that the district court limited his trial evidence to the summary judgment record bears on the question of prejudice. The limitations were memorialized in the court's limine rulings, which will also be addressed in the prejudice context.

### A. Contextual Evidence

Reed contends the district court "restricted evidence regarding the fact that [his] position was created entirely because of the DOT's non-compliance with Title VI and evidence of what had been done between 2008 and the time Reed was hired." We agree this type of contextual evidence was relevant to his claims of discrimination and retaliation. *See, e.g.*, *Bennett v. Nucor Corp.*, 656 F.3d 802, 811 (8th Cir. 2011) (affirming district court conclusion that evidence of prior events was relevant). But contrary to Reed's assertion, the trial record is replete with evidence of the context surrounding his hire. Most critically, a 2008 civil rights baseline

assessment report was admitted. The report identified deficiencies in the DOT's administration of its civil rights program and recommended the creation of a civil rights unit and civil rights coordinator position.

Reed also testified without objection about the meaning of Title VI, his surprise at discovering there "was no Title VI plan" at the time of his hire, his belief that the existing outreach program to increase the number of minorities and females was "anemic," and his belief that, before his hire, "[T]hey were not having much success filling certain job classes within the DOT." He testified there were no working documents "[b]ecause the agency was in violation of not doing Title VI." He cited the 2008 baseline report and explained various recommendations contained in the report. For example, he testified, "[T]he DOT did not have the civil rights program documented or in a manual form and we needed to be able to develop the program, provide that to the Federal Highways because that gave them an idea of what we would work on, timetables and those kinds of things." Reed pointed to another portion of the report and explained:

> Those are the requirements by the Federal Government that we
> would not discriminate in the way we dispense federal funds and so
> we had to come up with a letter, document that would be signed by
> the agency director that we would not discriminate in the way we
> did business with those federal funds.

The district court did not exclude contextual evidence, and we discern no abuse of discretion in the district court's pretrial and trial rulings concerning this type of evidence. On remand, this evidence is admissible.

### B. Evidence of Similarly Situated Individuals

As to both the discrimination and retaliation claims, the jury was instructed that it could "infer intentional discrimination and/or retaliation were motivating factors

in the Defendant's decision to terminate his employment if the Plaintiff . . . proved that the Defendant's asserted reasons for terminating his employment were not its true reasons but were a pretext to hide intentional discrimination or retaliation." Reed argues evidence relating to his white "predecessor" Roger Bierbaum and his white successor Karen Kienast was relevant to establish discriminatory intent and pretext. The State counters that Bierbaum and Kienast were not "similarly situated."

Evidence of how similarly situated employees were treated is relevant to the third stage of the *McDonnell Douglas* framework. Specifically, after an employer articulates legitimate nondiscriminatory reasons for its actions, an employee may offer evidence that similarly situated employees were treated differently. *See Townsend v Bayer Corp.*, 774 F.3d 446, 460 n.3 (8th Cir. 2014) ("Evidence of similarly-situated comparators is part of the framework under *McDonnell Douglas* . . . to show whether an employer's stated reason for taking adverse action against an employee is merely a pretext for unlawful retaliation."); *see also Wing v. Iowa Lutheran Hosp.*, 426 N.W.2d 175, 180 (Iowa Ct. App. 1988) ("We conclude the . . . trial court could find that the plaintiff showed the following in reference to pretext: (1) that similarly situated employees were treated differently; (2) that plaintiff's relevant abilities and potential were at least equal, if not superior, to those persons retained; and (3) where the plaintiff was the only one in patient accounts let go, and where she, along with four others, were all over the age of forty that were let go in the financial area, this provides substantial evidence of discrimination. We find that age was a factor in plaintiff's termination.").

### *1. Bierbaum*

Bierbaum was not similarly situated to Reed. *See Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1163 (8th Cir. 2016) ("At the pretext stage, 'the test for determining whether employees are similarly situated to a plaintiff is a rigorous one.' [The plaintiff] must show that she and the employees outside of her protected group were 'similarly situated in all relevant respects.' '[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'"); *Wyngarden v. State Jud. Branch*, No. 13-0863, 2014 WL 4230192, at *9 (Iowa Ct. App. Aug. 27, 2014) (same). Although Bierbaum was in charge of Title VI compliance before Reed was hired, he was not supervised by Sadler and did not perform any sub-recipient reviews. As the district court stated,

> Mr. Bierbaum and what happened before Mr. Reed was hired into the Civil Rights Unit, again, I find that not to be relevant because Mr. Bierbaum was not in the same position as Mr. Reed, he was not supervised by the same person, he didn't have the same job, the allegations of misconduct that led to Mr. Reed's firing as far as the State is concerned are more than that he did not perform the job with respect to contractor reviews and et cetera.
>
> In Mr. Reed's own deposition, he stated that it was emphasized to him when he was hired that this is what his job was going to be and the summary judgment record reflects that there was a different expectation with respect to that issue in the department when Mr. Bierbaum had that responsibility than when Mr. Reed was hired into that job.
>
> The two situations just aren't similar enough under the standard of relevance of evidence to allow an argument that, well, Mr. Bierbaum didn't do this either and he wasn't fired. That's my ruling and my ruling is the same on that.
>
> It's just not—under the standard for putting on evidence to suggest that people were treated differently, there has to be some minimum standard of them being in similar situations and I don't think the evidence about Mr. Bierbaum meets that standard.

Even if Bierbaum could be viewed as similarly situated to Reed, Reed makes no argument that Bierbaum was treated differently for making the same alleged mistakes. He simply asserts Bierbaum's testimony was relevant to show "the DOT knew [he] was performing his job duties well in light of the agency's history of non-compliance and given the limited support and resources he was offered to work with." As noted, the agency's history of noncompliance was established by Reed through his discussion of the 2008 assessment report. Reed also testified to his lack of support during the first year of his tenure at the department and his positive reviews despite the absence of resources. Bierbaum's testimony would have added little on that score. *See Durant Elevator Co. v. S. J. Hoffman & Sons*, 145 N.W.2d 25, 28 (1966) ("The exclusion of evidence tending to show a certain fact is not reversible error when the fact in question is fully established by other admitted evidence."). We conclude the district court properly excluded testimony by or about Bierbaum.

In reaching this conclusion, we recognize evidence was admitted about a letter Bierbaum drafted concerning contractors' compliance with Title VI. Reed disagreed with the remedy Bierbaum proposed and complained to his superiors about the letter. This evidence was relevant to the retaliation claim that was submitted to the jury. Nothing in our opinion should be construed as precluding the admission of this evidence on retrial.

### 2. Kienast

Kienast, on the other hand, was similarly situated. She took over Reed's position as civil rights coordinator after he was terminated. *See Ebersole v. Novo*

*Nordisk, Inc.*, 758 F.3d 917, 925-26 (8th Cir. 2014) (concluding employee was similarly situated to plaintiff because he (1) worked in the same district, (2) answered to the same supervisors, and (3) engaged in similar conduct).

In an offer of proof, Reed's attorney attempted to establish the number of sub-recipient reviews performed by Kienast relative to Reed. Sadler demurred.

The district court ruled as follows:

> So there had been questions asked in here about 2014 and how many reviews were done basically after Mr. Reed left.
> I am going to allow that in as relevant only for the purpose of its tendency to show how many reviews can be done, I guess, *not to compare what happened after Mr. Reed left to what happened while he was there* because I don't think for reasons I have said over and over again that the plaintiff had laid a foundation to actually make comparisons about the treatment of employees based on, you know, the time periods.
> For example, just to say, well, after he left there were only five reviews done and the person that replaced him wasn't disciplined or anything, that's not relevant in this case because it has no context or showing of similar circumstances. So the only reason I am allowing it to come in is to, I guess, from the plaintiff's point of view sort of show what could be done.

(Emphasis added.) Reed's attorney challenged the court's refusal to allow Kienast's testimony for comparison purposes. He stated, "[T]o limit our ability to mention the race or to compare or contrast the expectations on a white female that replaced our client in a race claim is likewise prejudicial and we would object to any position that limits our ability to prove this case in that way."

Consistent with the court's pretrial ruling, Reed was allowed to question Sadler about the civil rights unit's failure to meet a federal target for completion of sub-recipient reviews following Reed's termination. But Reed was not allowed to delve into whether Kienast was disciplined for failing to meet performance or

productivity goals. The exclusion of evidence by or about Kienast amounted to an abuse of discretion.

In addition, the exclusion of this evidence was prejudicial. As noted, the jury was instructed to determine whether the reasons for Reed's firing were pretextual or arose from discriminatory intent. The question was central to both the discrimination and retaliation claims. The exclusion of evidence relating to Kienast's performance prevented the jury from gaining a complete picture of this critical issue. *See Houston v. Easton Area Sch. Dist.*, 355 F. App'x 651, 656 (3d Cir. 2009) ("Evidence of additional similarly situated employees outside of Houston's protected class—each of whom received or was promised 100% of his sick pay upon retirement—likely would have changed the entire complexion of the trial.").

Although Reed's focus was narrowed by the court's ruling on the State's motion in limine, the court forced Reed to limit the landscape even further in his opening statement to the jury. Shortly after Reed's attorney began outlining the evidence, the State objected to certain language he used. The district court ordered defense counsel to show the State the slides on which his opening statement was based. Reed's attorney challenged the order, stating, "I cannot believe that I have to parse out my opening statement to fit exactly within the prescribed preferences of defendants' way of phrasing of retaliation case and a race case." He continued, "[T]o not allow me to just frame it in that way or phrase it in that way I believe is prejudicial and you are allowing the defendant to effectively rewrite my opening statement." The State's attorney responded that she had "a handful more" objections based on the slides "but if [plaintiff's counsel] doesn't want to show the slides, that's fine." Nonetheless, the State raised "a couple points . . . based on the

slides," including an objection to "any reference to Civil Rights Unit and its dealings after Mr. Reed's termination to the extent that it references . . . anything after his February 14, 2013 termination."

Notably, there was no indication Reed's attorney intended to violate the limine ruling by making reference to post-termination evidence. In the absence of an imminent violation, the State's objections were, at best, premature. At worst, the objections threw Reed's attorney off his game by forcing him to revamp and redact his opening statement on the fly. In this way, the prejudice of the limine rulings was compounded.

Having concluded post-termination evidence relating to Kienast's job performance was admissible, we further conclude Reed's attorney should have been allowed to make reference to the evidence during his opening statement. *See State v. Miller*, 359 N.W.2d 508, 510 (Iowa 1984) ("'[C]ounsel are not held to the utmost strictness' when giving opening statements." (quoting *State v. Clark*, 140 N.W. 821, 823 (Iowa 1913)); c*f. Clark*, 140 N.W. at 823 (finding certain matters referred to in opening statements "improper and prejudicial"). Finally, we conclude the exclusion of evidence relating to Kienast entitles Reed to a new trial on his discrimination and retaliation claims that were submitted to the jury and the evidence is admissible on the retaliation claims on which summary judgment has been reversed.

### C. Evidence of Miskimins' Transfer

Reed argues he should have been allowed to introduce evidence regarding Miskimins' transfer. Having reversed the summary judgment ruling on whether Reed was fired in retaliation for complaining about Miskimins' transfer, we also reverse the

district court's exclusion of this evidence for purposes of proving that retaliation claim.

The question remains whether evidence of Miskimins' transfer was relevant to the discrimination and retaliation claims submitted to the jury. Reed testified to the transfer as follows:

> Q. So you mentioned Maria Hobbs' position eventually got posted and filled, correct? A. Yes.
> Q. And who is that employee? A. Jacqui Miskimins.
> Q. She was hired to be what position was that? A. The external civil rights administrator.
> Q. And she was actually going to be working on Title VI compliance with you, right? A. Yes.
> Q. So she wasn't like the people who came over from the other office that already had their own jobs? A. No. She was expected to carry out the central functions of external civil rights coordinator.
> Q. And was she able to hit the ground running when she started? A. No.
> Q. What do you mean by that? A. When she came over or was hired into the external civil rights position, she sent a memo out to everyone that said that she has no experience or background doing human civil rights or disadvantaged business enterprise work so—

At this point, the State objected. The State argued the line of questioning violated the court's ruling on a motion in limine "because . . . the word 'transfer' wasn't utilized in the question or within the answer." The State moved for mistrial and asked the court for an instruction to disregard the answer. Reed's attorney explained that the evidence was excluded for purposes of the retaliation claim but could "come in for many other purposes." The court denied the mistrial motion but instructed the jury to disregard the entire line of questioning. The court reasoned,

> The clear implication of that line of questioning is that unqualified person was hired to this position and I am sure it will come out at some point during the trial that she is Caucasian and I have ruled quite clearly in the summary judgment ruling that the circumstances

> surrounding Miss Miskimins being hired to that position do not warrant a claim of retaliation, not only because there was no choice that she was hired but because the summary judgment record had absolutely no evidence that Mr. Reed ever claimed that she was hired because of discrimination.
>
> . . . .
>
> [The last question and answer] leave[] a false impression that [Miskimins] was hired to that position [and] told the person that hired her that she wasn't qualified and despite that she was hired. . . . That leaves a jury wondering, wow, they are hiring people over there who even say they are not qualified for the job. Well, that's not a fair implication to leave based on the record and the evidence in the case.

We believe the evidence of Miskimins' transfer was improperly limited. The evidence of Miskimins' qualifications and Reed's complaints about her qualifications was relevant to Reed's claim of race discrimination, which required proof "the Plaintiff's race was a motivating factor in the defendant's decision to terminate his employment." The evidence was also relevant to the retaliation claim submitted to the jury, which had the same causation element. The limitation of this evidence amounted to an abuse of discretion. *See Peters v. Risdal*, No. C12-4070-MWB, 2013 WL 9839011, at *4 (N.D. Iowa Dec. 5, 2013) ("[I]t is proper to exclude evidence that is offered to dispute *a claim or defense* or a *legal issue* that has already been determined as a matter of law at summary judgment . . . , but neither of [the cited opinions] teaches that a court is required to bind a party at trial to *certain facts* that were deemed admitted at summary judgment by failure of a party to dispute them properly.").

The prejudice to Reed again flowed from the jury's inability to glean the complete picture. Had the jury known of Reed's concerns about Miskimins' qualifications, jurors may have viewed the testimony about her transfer differently. We reverse and remand the discrimination and contractor-retaliation claims for new

trial. On remand, we conclude Reed may present evidence about Miskimins to support the race discrimination and retaliation claims, including the retaliation claims on which we reverse the grant of summary judgment.

### D. Evidence of Workplace Environment Complaint – Miskimins' Behavior

Reed contends he intended to offer evidence about "the investigation into him in response to a situation created by [Miskimins]." He argues this evidence was improperly excluded. To the contrary, Reed testified about Miskimins' use of the word "snarky" against another employee, the employee's filing of a complaint, Sadler's investigation of the complaint, and his view that, "as a result," they "began investigating" Reed. We discern no abuse of discretion in the district court's treatment of this issue. On remand, this evidence is admissible.

## IV. Disposition

We reverse the summary judgment rulings on Reed's retaliation claims grounded in the filing of a civil rights complaint and his complaint about Miskimins' transfer. We remand for trial on those grounds.

We reverse the exclusion of evidence relating to Miskimins and Kienast in connection with the discrimination and retaliation claims that were tried. We remand for a new trial on those claims. The evidence is also admissible in connection with the retaliation claims on which summary judgment was reversed.

On trial and retrial, the contextual evidence admitted at the first trial is admissible, as is evidence relating to the investigation of the workplace environment complaint against Miskimins. The admitted evidence relating to Bierbaum remains

admissible. The excluded evidence relating to Bierbaum remains inadmissible.

**REVERSED AND REMANDED.**